# Appendix A

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, KANSAS

| | |
|---|---|
| GRANT TOWNSHIP; PINES INTERNATIONAL, INC.; ) <br> NORTH LAWRENCE IMPROVEMENT ASSOCIATION; ) <br> NANCY THELLMAN; SCOTT T. THELLMAN, SR.; ) <br> JUNIPER HILL FARMS, LLC; SCOTT T. ) <br> THELLMAN, JR.; JOSHUA PETERS; AMBER ROSS; ) <br> IRONSTONE EVENTS, LLC; BONNYE ) <br> LITTLE-HADL; PAULETTE SCHWERDT; DORANCE ) <br> LITTLE; STACEY WENDLAND; ) <br> NANCY YONNALLY; SOS KAW VALLEY, LLC; ) <br> TED BOYLE; MARC WILBORN; SUSAN WILBORN; ) <br> LAZY SUSAN FARMS, LLC; LISA HARRIS; ) <br> RICK FRYDMAN; LOWELL NEITZEL; ) <br> AND KRYSTALE NEITZEL, ) <br> ) <br> PLAINTIFFS, ) <br> ) <br> V. ) <br> ) <br> THE BOARD OF COUNTY COMMISSIONERS OF ) <br> THE COUNTY OF DOUGLAS COUNTY, KANSAS, ) <br> ) <br> DEFENDANT. ) | FILED <br> DISTRICT COURT DP <br> 2024 JUN 20 PM03:41 <br><br> CASE NO. DG-2024-CV-000153 <br><br> JURY TRIAL DEMANDED |

## AMENDED PETITION FOR REVIEW AND INJUNCTIVE RELIEF

COMES NOW Plaintiffs Grant Township; Pines International, Inc.; North Lawrence Improvement Association; Nancy Thellman; Scott T. Thellman, Sr.; Juniper Hill Farms, LLC; Scott T. Thellman, Jr.; Joshua Peters; Amber Ross; Ironstone Events, LLC; Bonnye Little-Hadl; Paulette Schwerdt; Dorance Little; Stacey Wendland; Nancy Yonnally; SOS Kaw Valley, LLC; Ted Boyle; Marc Wilborn; Susan Wilborn; Lazy Susan Farms, LLC; Lisa Harris; Rick Frydman; Lowell Neitzel; and Krystale Neitzel ("Plaintiffs") by and through their undersigned counsel, and for their Amended Petition for Review and Injunctive Relief, allege and state as follows:

1

Table of Contents

Introduction ................................................................................................................... 4

Jurisdiction and Venue ................................................................................................. 5

Parties ............................................................................................................................ 5

Facts ............................................................................................................................... 8

    Commissioner Willey's "Crew" ................................................................................ 8

    Commissioner Willey's "Four Points" ...................................................................... 9

    The December 5, 2023, Meeting ............................................................................... 11

    Commissioner Willey's Undisclosed Advocacy of the Project to obtain her Four Points ....... 12

        Hiring a "Trusted" Third-Party Agrivoltaics Manager ...................................... 14

        Investing Money in the Project's Agrivoltaics Proposal .................................... 17

        Collaborating with Local Partners to Advance Agrivoltaics ............................ 19

        Changing Leases with Landowners to Open More Land for Potential Agrivoltaics ........ 20

    The Project Violates Binding County Contracts, Policies, and Studies .................... 20

        The Comprehensive Plan .................................................................................... 20

        Solar Regulations ............................................................................................... 24

        Northeast Sector Plan ........................................................................................ 25

        North Lawrence Drainage Study ........................................................................ 30

        Food System Plan .............................................................................................. 32

        Open Space Plan ................................................................................................ 33

        The Airport's FAA-Regulated Wildlife Mitigation Zone and Glare Impacts ........ 34

        The Code's Maple Grove Stormwater Management Standards ......................... 37

        Federal and Kansas policies support the Valley's use for farming .................... 40

    The Commission's Expressed Intent to Violate its Supermajority Vote Requirement by Piecemealing its Decisions ....... 41

    The County Attempts to Paper Over Their Unreasonable Actions ........................... 43

    The Board's Action was Unreasonable ...................................................................... 44

        The Board's Unreasonable Action Violates the *Golden* Factors ...................... 45

            The neighborhood's agricultural and residential character .................... 46

            Nearby properties' agricultural and residential zoning and use ............. 49

            The subject properties' unique suitability for agriculture ...................... 51

            The detrimental affect to nearby properties caused by the CUP ........... 53

            The subject properties' lack of vacancy in agricultural production ........ 72

            The destruction of the Plaintiffs' property values are not offset by any purported de minimis public health, safety, or welfare benefit ....... 72

Commissioner Willey's directives, involvement, and leading of the Project's Application has compromised the recommendations of permanent or professional staff ................................................................................................ 75

An industrial power plant in the Valley violates the Comprehensive Plan .......... 76

Bias of the Planning Commissioners and Commissioners .................................... 83

The availability of adjacent land....................................................................... 87

The County Failed to Consider Mandated Criteria, Violating the County Code.............. 88

Claims for Relief.................................................................................................... 92

Count 1 –.......................................................................................................... 92

Petition for Review of Reasonableness of County Action Pursuant to K.S.A. 12-760 .......... 92

Count 2 – Mandamus ........................................................................................ 94

Count 3 –.......................................................................................................... 95

Declaratory Judgment, Violation of Rights Secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution and the Kansas Constitution 95

Count 4 – Breach of Contract ............................................................................ 96

Jury Trial Demand .............................................................................................. 97

## INTRODUCTION

1.      The approval of Savion/Evergy's request for Conditional Use Permit, CUP-23-00312 (the "Application," "CUP," or "Project"), was pre-determined by the County. Commissioner Karen Willey, a well-known opponent of production farming and a critic of the accepted farming principles that enable Kansas farmers to feed the world, orchestrated the request and approval process to fulfill her pre-set personal agenda.

2.      In 2023, following her appointment as a replacement for a resigned commissioner, Commissioner Willey determined to use her newly minted official authority to impose her personal agricultural philosophy on the farmers along the alluvial plain adjacent to the Kansas River, north of Lawrence ("the Valley") by converting productive agricultural acreage to an industrial power plant. To achieve her goal of eliminating production agriculture in the Valley, Commissioner Willey assembled her "crew," comprised of City of Lawrence and County staff, personal friends, and business associates.

3.      Commissioner Willey then formulated, organized, and orchestrated the "Four Points" that she traded with Savion/Evergy in exchange for the County's approval of the Project. To hide her involvement and give the appearance of legitimacy, Commissioner Willey veiled her advocacy with the buzzword "agrivoltaics." The resulting "Kanas Sky Energy Center" CUP for a 1,103-acre, 159-megawatt industrial solar power plant was signed, sealed, and delivered before the public was given notice that the Project had even been proposed, much less before citizens— including Plaintiffs—were given notice and a right to be heard. As such, the ultimate public hearings were illusory, a charade at which the County gave its citizens and Plaintiffs nothing more than the appearance of the hearing required by fundamental due process rights.

4

4.    In its haste to approve the Application, the County ignored Kansas law, the Lawrence-County joint Comprehensive Plan, applicable Solar Regulations, the Northeast Sector Plan, the North Lawrence Drainage Study, the Food System Plan, the Open Space Plan, the Lawrence Airport's FAA-Regulated Wildlife Mitigation Zone and glare issues, and the Maple Grove Stormwater Management Standards. And the County did so without consulting Grant Township, the governing body in which the power plant would be constructed.

### JURISDICTION AND VENUE

5.    The Court has jurisdiction over the parties and subject matter pursuant to K.S.A. 12-760; K.S.A. 12-761(b); K.S.A. 60-1701; and K.S.A. 20-301.

6.    Venue is proper in this Court because the County is located within Douglas County, the alleged actions took place in Douglas County, and the real property at issue is located in Douglas County.

### PARTIES

7.    Plaintiff Grant Township, a body politic that may sue in its own name, operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

8.    Plaintiff Pines International, Inc, operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

9.    Plaintiff North Lawrence Improvement Association operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

10.   Plaintiff Nancy Thellman is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

11.   Plaintiff Scott T. Thellman, Sr., M.D., is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

12. Plaintiff Juniper Hill Farms, LLC, operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

13. Plaintiff Scott T. Thellman, Jr., is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Thellman is an owner of Plaintiff Juniper Hill Farms, LLC.

14. Plaintiff Joshua Peters is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Peters is an owner of Plaintiff Ironstone Events, LLC.

15. Plaintiff Amber Ross is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Ross is an owner of Plaintiff Ironstone Events, LLC.

16. Plaintiff Ironstone Events, LLC, operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

17. Plaintiff Bonnye Little-Hadl is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

18. Plaintiff Paulette Schwerdt is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

19. Plaintiff Dorance Little is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

20. Plaintiff Stacey Wendland is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

21. Plaintiff Nancy Yonnally is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

22. Plaintiff SOS Kaw Valley, LLC, operates within Douglas County, Kansas, and is aggrieved by a decision of the County.

23.     Plaintiff Ted Boyle is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

24.     Plaintiff Marc Wilborn is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Wilborn is an owner of Plaintiff Lazy Susan Farms, LLC.

25.     Plaintiff Susan Wilborn is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Wilborn is an owner of Plaintiff Lazy Susan Farms, LLC.

26.     Plaintiff Lazy Susan Farms, LLC, operates within Douglas County, Kansas, and is aggrieved by a decision of the County. Lazy Susan Farms operates an 80-acre pecan tree farm.

27.     Plaintiff Lisa Harris is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County. Harris is a former Commissioner on the Lawrence/Douglas County Metropolitan Planning Commission ("Planning Commission") and was a member of the steering committee for the Comprehensive Plan.

28.     Plaintiff Rick Frydman is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

29.     Plaintiff Lowell Neitzel is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

30.     Plaintiff Krystale Neitzel is a resident of Douglas County, Kansas, and is aggrieved by a decision of the County.

31.     Defendant The Board of County Commissioners of the County of Douglas County, Kansas ("County"), is a Kansas municipal corporation comprised of three County Commissioners ("Commissioners") and located in Douglas County, Kansas.

<u>FACTS</u>

**Commissioner Willey's "Crew"**

32.      To advocate on behalf of the Applicant and secure approval of the Application, Commissioner Willey gathered together a group she self-described as her "crew" or her "team."

33.      In contrast, Commissioner Willey was careful to describe County employees as her "staff."

34.      Commissioner Willey's self-described "crew" included:

    a.   City of Lawrence employee ***Mary Miller***, the City/County Planner II for Planning and Development Services. Ms. Miller acted as the lead planner on the Project and was responsible for creating the Staff Report on the Project. Upon information and belief, Ms. Miller was an unwilling participant on Commissioner Willey's "crew" and believed its conduct was improper.

    b.   County employee ***Tonya Voigt***, the County's Director of Zoning and Codes. Ms. Voigt has been responsible for helping Ms. Miller prepare the Staff Report. Upon information and belief, Ms. Voigt was an unwilling participant on Commissioner Willey's "crew" and believed its conduct was improper.

    c.   County employee ***Kim Criner Ritchie***, the County's Sustainability Manager.

    d.   State of Kansas employee ***Kelly Kindscher***, a plant ecologist with the Kansas Biological Survey. Mr. Kindscher's participation on the "crew" was focused on consulting on vegetative management within agrivoltaics.

    e.   State of Kansas employee ***Amber Thumann***, who teaches "permaculture" forms of agriculture and is also employed by Futureful, LLC, a grant writing enterprise that

employes Commissioner Willey. Ms. Thumann was the designated agrivoltaics "consultant."

**Commissioner Willey's "Four Points"**

35.　Commissioner Willey developed a set of "Four Points," that she required before she—and the County—would agree to approve the Project.

36.　Commissioner Willey's Four Points were:

a.　Investing money into the Project's (nonexistent) agrivoltaics proposal;

b.　Hiring a "trusted" third-party agrivoltaics manager;

c.　Collaborating with local partners to advance agrivoltaics; and

d.　Changing leases with landowners to open more land for potential agrivoltaics.

37.　When Commissioner Willey informed Savion/Evergy of her Four Points, the Project did not contain agrivoltaics.

38.　Commissioner Willey's Four Points were a personal requirement that are not supported by any decision of the Planning Commission or County Commission, nor are they grounded in or derived from *any* policy or document adopted by the County. They are not in the Comprehensive Plan, the County Code, the Solar Regulations, or applicable stormwater management plans. They are the personal mandates of an individual Commissioner.

39.　By November 2023, Commissioner Willey engaged co-employee of Futureful, LLC, Ms. Thumann, to develop an agrivoltaics plan for Savion/Evergy to use in its Application—despite the Application not including actual agrivoltaics but being an active Application before the County.

40.    On November 29, 2023, as a "starting point," Ms. Thumann sent the initial agrivoltaics plan for Savion/Evergy's Application to Commissioner Willey. In her email, Ms. Thumann told Commissioner Willey:

> I would also like to propose that the long term management of the farming operation be embedded in DG county's sustainability office, funded by Evergy. I am happy to sign on as a consultant to set everything up, develop the operating agreement, create the partnerships and get this running (3 to 4 year contract I think) and then transition operations over to whoever makes sense in the county. I have no preference on whether Evergy pays me or the county with Evergy's money. The more I thought about it, the less it felt like a good fit for KPI or even KRC. They are really not land management organizations.

41.    Ms. Thumann sent the materials to Commissioner Willey's *personal* email address, not her *official County* email address.

42.    It is unclear whether Ms. Thumann was acting in her capacity as an employee of the State of Kansas or as a fellow employee of their mutual employer, Futureful, LLC.

43.    Meanwhile, on December 3, 2023, Commissioner Willey texted Tyler Lindquist, Chair of the Douglas County Food Policy Council, for the express purpose of building public support for the Project, specifically including agrivoltaics, as developed and ultimately amended into the Application by Commissioner Willey.

44.    Commissioner Willey also told Lindquist that "[a] few of us are talking about what else we would need to see in the Savion plan to be supportive."[1]

45.    Mr. Lindquist sought "[t]o clarify this would be a conversation of my own thoughts, not on behalf of the council."[2]

46.    Commissioner Willey and Mr. Lindquist spoke on December 4, 2023.

---

[1] Willey Text to Lindquist, Sunday, December 3, 2023, at 1:10 p.m.
[2] Willey Text to Lindquist, Sunday, December 3, 2023, at 1:24 p.m.

### The December 5, 2023, Meeting

47.     On December 1, 2023, Commissioner Willey texted Ashton Martin and asked Mr. Martin to call her.[3] Mr. Martin is a Senior Permitting and Environmental Manager for Savion/Evergy and is its lead project manager on the Application.

48.     Four days later, on December 5, 2023, Martin met with Commissioner Willey and her "crew," but not her "staff."

49.     At Martin's side at the meeting with Commissioner Willey and her "crew" was Savion's attorney, Matthew S. Gough, although no attorney for the County was in attendance.

50.     Commissioner Willey made clear that the point of the meeting was to improve the Application to obtain County approval, making sure the invitees only included "folks willing to think creatively for problem solving. No nay sayers allowed yet."[4]

51.     Commissioner Willey led the meeting and told Martin and Gough that (i) she had read the Application; (ii) she was concerned the Application (and especially its agrivoltaics proposal) was weak; and (iii) she was afraid the Application would fail.

52.     Commissioner Willey directed Martin and Gough that Savion/Evergy needed to improve the agrivoltaics proposal, and offered to draft language for the Application. Commissioner Willey then recommended that Savion/Evergy hire Ms. Thumann to rewrite the Application's agrivoltaics proposal.

53.     When Commissioner Willey offered to draft the agrivoltaics proposal, she had already engaged Ms. Thumann to do precisely that, and she was already in possession of the agrivoltaics proposal Ms. Thumann sent to her on November 29, 2023.

---

[3] Willey Text to Martin, Friday, December 1, 2023, at 7:56 a.m.
[4] Willey Text to Amber Thumann, Saturday, December 2, 2023, at 3:06 p.m.

54.     Commissioner Willey told Martin and Gough that Savion/Evergy's Application needed to include Commissioner Willey's Four Points.

55.     Following the meeting, at least one County employee blew the whistle on Commissioner Willey's advocacy and involvement in Savion/Evergy's active Application before the County. County Administrator Sarah Plinsky instructed Commissioner Willey to stop meeting with Savion/Evergy and contact the County Counselor.

56.     Upon information and belief, County Administrator Plinsky informed Commissioner Willey about the whistleblowing because, after the meeting, Commissioner Willey texted three of the meeting's attendees, including non-County employees Kelly Kindscher and Amber Thumann. After thanking this subset of her "crew" (which did not include potential whistleblowing County employees), she noted the next meeting "might be led by Tonya and Kim on some draft language to discuss with Evergy/Savion." Both Tonya Voigt and Kim Criner Ritchie are County employees. But undeterred by Administrator Plinsky's warning, Commissioner Willey noted her "crew" should "[c]ount me in for whatever is helpful!"[5]

57.     Mr. Kindscher agreed the meeting with Savion/Evergy was productive, but he revealed: "[w]e had to move past several no we can't statements, but their [sic] were good cooperative statements at the end."[6]

58.     Ms. Thumann agreed and "look[ed] forward to seeing where we go from here."[7]

**Commissioner Willey's Undisclosed Advocacy of the Project to obtain her Four Points**

59.     Commissioner Willey continued to work on Savion/Evergy's Application and rework the agrivoltaics proposal to her liking.

---

[5] Willey Text to Crew Subset, Tuesday, December 5, 2023, at 12:54 p.m.
[6] Willey Text to Crew Subset, Tuesday, December 5, 2023, at 2:26 p.m.
[7] Willey Text to Crew Subset, Tuesday, December 5, 2023, at 2:27 p.m.

60.     However, her actions and directions were *ex parte* and not visible to the public's eye.

61.     Commissioner Willey never disclosed the full extent of her personal involvement, *ex parte* communications with Savion/Evergy, "crew's" involvement, work to amend the Application to include her "Four Points," or the December 5, 2023, *ex parte* meeting.

62.     Upon information and belief, additional undisclosed, and as of yet undiscovered, *ex parte* meetings and conversations occurred.

63.     For example, on March 9, 2023, Savion's agrivoltaics consultant, Jacqueline Smith, sent Commissioner Willey a text message out of the public eye:[8]

> Yes! I do think Savion
> has heard your 4
> points. Way to go. 😊

There was no disclosed meeting between Commissioner Willey and Ms. Smith on March 9, 2023. And although there was a Commission Board Meeting on March 8, 2023, neither its agenda nor its minutes evidence any discussion of Savion/Evergy's Application or Commissioner Willey's Four Points.

64.     Commissioner Willey's continued involvement, even after County employees blew the whistle on her inappropriate *ex parte* advocacy, is evidenced by her documented efforts to obtain Savion/Evergy's commitment to her Four Points in exchange for the County's approval of the Application.

---

[8] Smith Text to Willey, March 9, 2024, at 8:21 a.m.

<u>Hiring a "Trusted" Third-Party Agrivoltaics Manager</u>

65.     Simultaneously, Commissioner Willey worked *ex parte* and in an undisclosed role to obtain a third-party agrivoltaics manager, that she personally trusted, acceptable to her.[9]

66.     First, Commissioner Willey took it on herself to recruit The Nature Conservancy of Kansas ("TNC") while directing Ms. Thumann to recruit Kansas Permaculture Institute ("KPI").[10]

67.     On December 12, 2023, Commissioner Willey emailed TNC, requesting "some help" to "stand up a new program."[11] She revealed that "[w]hat I am looking for in a lead organization is stability and mutual trust. I will start reaching out to the top few choices to learn more about the ones I don't know well, but if there is a chance that TNC might consider a role here, I would be delighted to talk further."[12]

68.     Unsurprisingly, and armed with the inside, nonpublic information Commissioner Willey disclosed, TNC responded that they were "very interested in being the lead organization on the agrivoltaic program," and requested to "reconnect with [Commissioner Willey] to see if it would be a good fit."[13]

69.     Describing her work on behalf of Savion/Evergy as "exciting indeed!", Commissioner Willey asked both when TNC was ready to meet with "a few county staff," and the ability to separately disclose TNC's interest "with my team."[14]

70.     And after TNC asked for any "upfront considerations from the county's perspective," Commissioner Willey disclosed "[i]t would be important to bring in at least our

---

[9] Willey Text to Amber Thumann, Saturday, December 12, 2023, at 12:59 p.m.
[10] Willey Text to Amber Thumann, Saturday, December 12, 2023, at 12:59 p.m., 12:21 p.m., 1:22 p.m.
[11] Willey Email Chain with TNC, December 12-14, 2023.
[12] Willey Email Chain with TNC, December 12-14, 2023.
[13] Willey Email Chain with TNC, December 12-14, 2023.
[14] Willey Email Chain with TNC, December 12-14, 2023.

sustainability coordinator and zoning director to capture the conversations we have had on this program so far."[15] Willey reiterated that "[i]t's a good team."[16]

71.     On December 14, 2023, Commissioner Willey revealed to County Administrator Plinsky, Ms. Criner Ritchie, and Ms. Voigt:[17]

> The Nature Conservancy is interested in being a third party contractor for an agrovoltaics program. I've asked them to meet with at least Kim and Tonya to see if we are on the same page to begin.

72.     Minutes later, Commissioner Willey asked the same three County employees:[18]

> Ideally, who all do we need in the meeting? Are we ready to committ some of our ideas to paper and share? Are there other partners to pursue or run with TNC for now?

73.     Still without a response, Commissioner Willey emailed *again* that night with a link to an agrivoltaics conference Mr. Lindquist told her about, asking, "[m]ight anyone be interested in this conference? I am."[19]

74.     On December 21, 2023, TNC emailed Commissioner Willey, noting "we are working through some internal due process so we can engage on a regulated issue. Attached is the rough concept that we are using for that process. Would you be able to review it and let us know if we are on the right track with what we had previously discussed?"[20]

75.     On January 5, 2024, at 2:00 p.m., Commissioner Willey met on Zoom with TNC's representatives and County Administrator Plinsky. Following the meeting, Commissioner Willey sent the following:

---

[15] Willey Email Chain with TNC, December 12-14, 2023.
[16] Willey Email Chain with TNC, December 12-14, 2023.
[17] Willey Email to Plinsky, Criner Ritchie, and Voigt, December 14, 2023, at 12:32 p.m.
[18] Willey Email to Plinsky, Criner Ritchie, and Voigt, December 14, 2023, at 12:54 p.m.
[19] Willey Email to Plinsky, Criner Ritchie, and Voigt, December 14, 2023, at 9:19 p.m.
[20] Willey Email Chain with TNC, December 21, 2023, at 8:37 a.m.

| From: | Karen Willey |
|---|---|
| Sent: | 05 January 2024 22:07 |
| To: | Justin Cobb; Ben Postlethwait; Sarah Plinsky; Tonya Voigt; Kim Criner Ritchie |
| Subject: | Re: Agrovoltaics program |

Hello Sarah,I recognize that I am just one opinion on the commission and that agrovoltaics is just one facet of complex utility-scale solar energy projects. However, I think there is a need to help provide some clarity for companies that might apply under our regs. As I have been thinking about what elements of agrovoltaics could be beneficial for Douglas County, a couple elements rise to the top:A trusted third party- not county or energy company- would be the gatekeeper to vet projects and metrics for agrovoltaic projects (grazing, vegetables, seed crops, research). This would free up the energy companies from the liability of untested methods, but also give reassurance to the public that the best efforts to advance farmers and science would be pursued. There would be no cap or very few restrictions on the expansion of acres under agrovoltaics. Leases would need to be compatible with active agrovoltaics. This does not mean a set number of acres available at set intervals, but rather a fluid ability for practices to be expended as the program allows. The work needs to collaborate with multiple community partners that work to advance intersecting goals like ecology, habitat, research, diverse and beginning farmer training, local food, specialty crops, etc. and employ an equity lense.An investment in infrastructure available to producers would be key. A climate-controlled workspace with restrooms, classroom, wash-pack, and cold storage facilities would be ideal in order to serve small producers and on-site education. Livestock working and loading facilities would aid grazers. The KDA grant due 1/31 (https://agriculture.ks.gov/kda-services/grants-and-cost-share-programs/resilient-food-system-infrastructure-program) or similar could offset construction costs.

These are just my thoughts, and I would encourage prospective applicants to engage partners in creative discussion to explore how to move forward with a program that fills needs in Douglas County for research, farmer land access, and agricultural products.

Karen Willey, PhD
Douglas County Commissioner, District 3

76.     The same day, but at 11:32 p.m., Commissioner Willey sent another email:

| From: | Karen Willey |
|---|---|
| Sent: | 05 January 2024 23:32 |
| To: | Justin Cobb; Ben Postlethwait; Sarah Plinsky; Tonya Voigt; Kim Criner Ritchie |
| Cc: | Ashton Martin |
| Subject: | Re: Agrovoltaics program |

Hello Justin and Ben,
Thank you for the discussion this afternoon. I wanted to follow up with the four points I made in writing for you. I'm also copying Ashton Martin from Kansas Sky to be sure that I'm messaging the same to all partners!

I recognize that I am just one opinion on the commission and that agrovoltaics is just one facet of complex utility-scale solar energy projects. However, I think there is a need to help provide some clarity for companies that might apply under our regs. As I have been thinking about what elements of agrovoltaics could be beneficial for Douglas County, a couple elements rise to the top:

1. A trusted third party- not county or energy company- would be the gatekeeper to vet projects and metrics for agrovoltaic projects (grazing, vegetables, seed crops, research). This would free up the energy companies from the liability of untested methods, but also give reassurance to the public that the best efforts to advance farmers and science would be pursued.
2. There would be no cap or very few restrictions on the expansion of acres under agrovoltaics. Leases would need to be compatible with active agrovoltaics. This does not mean a set number of acres available at set intervals, but rather a fluid ability for practices to be expended as the program allows.
3. The work needs to collaborate with multiple community partners that work to advance intersecting goals like ecology, habitat, research, diverse and beginning farmer training, local food, specialty crops, etc. and employ an equity lens.
4. An investment in infrastructure available to producers would be key. for example, a climate-controlled workspace with restrooms, classroom, wash-pack, and cold storage facilities would be ideal in order to serve small producers and on-site education; livestock working and loading facilities would aid grazers. The KDA grant due 1/31 (https://agriculture.ks.gov/kda-services/grants-and-cost-share-programs/resilient-food-system-infrastructure-program) or similar could offset construction costs.

These are just my thoughts, and I would encourage prospective applicants to engage partners in creative discussion to explore how to move forward with a program that fills needs in Douglas County for research, farmer land access, and agricultural products. Sarah Plinsky is a great first point of contact for questions of county staff or commissioners. Thank you all!

Karen Willey, PhD
Douglas County Commissioner, District 3

77.     In its March 21, 2024, "Supplemental Materials" to its Application, Savion/Evergy formally advised the County that "Evergy has executed a Memorandum of Understanding [] with The Nature Conservancy" on March 18, 2024, wherein "TNC would administer agrivoltaics activities within the Project."[21]

78.     From October 8, 2023, to March 6, 2024, Commissioner Willey's husband was employed by TNC:[22]

| 2. | SPOUSE'S PLACE(S) OF EMPLOYMENT OR OTHER BUSINESS IN THE PRECEDING CALENDAR YEAR. If you have nothing to report in Section "E"2, check here _____ . | | |
|---|---|---|---|
| | NAME OF BUSINESS | ADDRESS | TYPE OF BUSINESS |
| 1. | The Nature Conservancy (*) | 4245 North Fairfax Dr., Sue. 1 | Conservation/research |
| 2. | * only between 10/8/23-3/6/24- now ended | Arlington, VA 22203 | |

<u>Investing Money in the Project's Agrivoltaics Proposal</u>

79.     Simultaneously, Commissioner Willey worked *ex parte* and in an undisclosed role to obtain a commitment within the Application to invest money earmarked for agrivoltaics.

80.     On December 18, 2023, Commissioner Willey emailed County Administrator Plinsky, Ms. Criner Ritchie, and Ms. Voigt with a grant opportunity, noting:[23]

| |
|---|
| Hi all,<br>This grant is to support just the kind of infrastructure the agrovoltaic program would need. Up to $3M and a 50% match needed. That might include the land and utilities put up by evergy. Due Jan 31. I think we could make a great case for this if we can pull partners together. If you all agree it's a good conversation, let's put our thoughts together and figure next steps. Maybe meet with TNC soon.<br>I got this through KRC, but the Kansas Specialty Crop Growers Association director also mentioned it as a great funding source for our ideas. |

---

[21] Application's Supplemental Materials at p. 3 (3/21/24).
[22] Statement of Substantial Interest for Local Office, Willey (signed March 11, 2024), *available at* https://apps.douglascountyks.org/mycounty/voting-and-elections/docs/reports/county/commission/candreport_kwilley_ssi_03132024.pdf.
[23] Willey Email to Plinsky, Criner Ritchie, and Voigt, December 18, 2023, at 6:31 p.m.

81.     This grant would fund a portion of the Project that Commissioner Willey had already told Savion/Evergy (and its attorney) was required in order to obtain the County's approval of the Application.

82.     Hours before, Commissioner Willey had already sent the grant link to TNC, her hand-picked agrivoltaics manager, stating the grant "could greatly ease startup costs for an agrovoltaic [sic] program's capital needs. When can your staff and mine meet to talk over possibilities?"[24]

83.     After Commissioner Willey disclosed her Four Points in the December 5, 2023, meeting, Savion/Evergy claimed it was contributing $100,000.00 to fund it, fulfilling a Four Points requirement to obtain approval of the Application.

84.     During a public meeting on March 27, 2024, Commissioner Willey rhetorically asked, "Is $100,000 enough for Agrivoltaics?"

85.     This meeting was attended by County Administrator Plinsky and counsel for the County.

86.     Understanding Commissioner Willey's comment as the directive it was intended to be, Savion/Evergy then increased its funding to $250,000.00 for the agrivoltaics "research."

87.     Upon information and belief, the first draft of the Solar Regulations required such a "financial donation" from an applicant for some undefined agrivoltaics element. However, this requirement was rejected by County employees because it appeared to be an unlawful bribe. Commissioner Willey had a heavy hand in the drafting of the Solar Regulations, long before she was on the Commission.

---

[24] Wiley Email to TNC, December 18, 2023, at 12:41 p.m.

<u>Collaborating with Local Partners to Advance Agrivoltaics</u>

88.    Meanwhile, Commissioner Willey worked *ex parte* and in an undisclosed role to obtain collaboration with local partners to assist Savion/Evergy in advancing agrivoltaics as mandated by her Four Points.

89.    On December 7, 2023, Commissioner Willey forwarded her "crew" an email from Mr. Lindquist, noting "[h]e shared some conversation he had had with community folks interested in agrovoltaics [sic]. See below. Sharing with permission."[25]

90.    On December 12, 2023, Mr. Lindquist asked Commissioner Willey if a letter of support from him would "carry any weight in the discussion?"[26] Mr. Lindquist worried his support would affect his relationship with other members of the Douglas County Food Policy Council.

91.    In response, Commissioner Willey encouraged Mr. Lindquist to submit his letter because she thought "pressure to deliver on agrivoltaics is a help from any source."[27] And to appease his conflict concerns, Commissioner Willey noted "I don't think you'll be alone – it looked like Dietrich was **diverging from the protectionist narrative**."[28]

92.    In its March 21, 2024, "Supplemental Materials" to its Application, Savion/Evergy formally advised the County that "TNC will establish an advisory board comprised of representatives of key stakeholder groups to evaluate projects and create metrics for agrivoltaics projects (e.g., grazing, vegetables, seed crops, research, etc.). [Savion], Evergy, and TNC believe this approach is the most effective way to enable collaboration with multiple community partners

---

[25] Willey Email to Voigt, Criner Ritchie, Thumann, Kindscher, December 7, 2023.
[26] Willey Text to Lindquist, December 12, 2023, at 9:46 a.m.
[27] Willey Text to Lindquist, December 12, 2023, at 10:30 a.m.
[28] Willey Text to Lindquist, December 12, 2023, at 10:30 a.m. (emphasis added).

in an equitable manner to advance intersecting goals including ecology, habitat, research, diverse and beginning farmer training, local food, [and] specialty crops."[29]

<u>Changing Leases with Landowners to Open More Land for Potential Agrivoltaics</u>

93.     At the same time, Commissioner Willey worked *ex parte* and in an undisclosed role to ensure leases with landowners were changed to open more land for potential—but uncommitted—agrivoltaics.

94.     During the December 5, 2023, *ex parte* meeting, and as part of her Four Points requirements, Commissioner Willey directed Savion/Evergy to change its leases with landowners within the Project Area so that more land *could* be used for agrivoltaics.

95.     As a result, in its March 21, 2024, "Supplemental Materials" to its Application, Savion/Evergy formally advised the County that the "Applicant has secured approvals and permissions from all applicable landowners to enable agrivoltaics uses on site. *See* Supplemental Exhibit 3.B. (Project leases have been amended to explicitly allow for agrivoltaics)."[30]

**The Project Violates Binding County Contracts, Policies, and Studies**

<u>The Comprehensive Plan</u>

96.     The citizens of Douglas County, by and through their elected officials within the City of Lawrence and the County, agreed to a Comprehensive Plan.

97.     The Comprehensive Plan was approved by the Lawrence City Commission on October 1, 2019, the County Commission on October 16, 2019, and the Planning Commission on November 20, 2019.

98.     The Comprehensive Plan was the result of years of work, roughly 50 public meetings, and a steering committee that devoted countless hours to its development.

---

[29] Application's Supplemental Materials at p. 3 (3/21/24).
[30] Application's Supplemental Materials at p. 3 (3/21/24).

99.     Plaintiff Lisa Harris was a member of the steering committee for the Comprehensive Plan, and Plaintiff Nancy Thellman was its co-chair.

100.    Plaintiff Nancy Thellman, then a Commissioner for Douglas County, moved to approve the Comprehensive Plan. The vote carried with all three Commissioners in favor.[31]

101.    The Comprehensive Plan is not merely an aspirational document that recorded amorphous values.

102.    Instead, the Comprehensive Plan "is a binding document" that "provide[s] guidance for elected and appointed officials" and "is a binding land use document," that "[a]ll development proposal must comply with."[32]

103.    The Comprehensive Plan acknowledges:

  a.  "The proximity of rural and agricultural land to the city provides beauty and respite, and we enjoy the economic and health benefits of a robust local food system";[33]

  b.  "Agriculture, the principal land use in rural Douglas County, is a major contributor to the county's economy";[34]

  c.  "Our citizens value preserving the agricultural lands to insure[35] continued agricultural production while maintaining the rural character of the county";[36]

---

[31] Meeting Minutes, Board of County Commissioners of Douglas County, October 16, 2019, *available at* https://www.douglascountyks.org/public-meetings/commission-board/2019/10/16/commission-board-meeting-wed-october-16-2019-530-pm.
[32] Comprehensive Plan at p. 6.
[33] Comprehensive Plan at p. 3.
[34] Comprehensive Plan at p. 3.
[35] Notably, the Comprehensive Plan describes a value to "insure" and not merely "ensure."
[36] Comprehensive Plan at p. 3.

     d.   Creating and maintaining "a robust agricultural sector valued for its economic, environmental, health and cultural contribution, including the emerging local and regional food system"[37]; and

     e.   "Conservation, protection, and promotion of our rural recreation and open spaces, as well as our growing agritourism opportunities."[38]

104.   The Comprehensive Plan requires the County to:

     a.   "identify[] and preserv[e] sensitive land as individual developments occur to maintain continuity throughout the ecosystem";[39]

     b.   "protect high-quality agricultural soils, as identified in each Specific Land Use Plan, as the community develops into urban densities";[40]

     c.   "Protect contiguous amounts of agricultural land in rural areas for continued productive future use";[41] and

     d.   "Develop programs to preserve and promote open spaces throughout Douglas County."[42]

105.   The Comprehensive Plan recognizes that Class 1 and Class 2 soils in the Valley—covered up with the Project—are "sensitive lands," and "high-quality agricultural soils."[43]

106.   "If a proposal does not comply with Comprehensive Plan requirements, then the applicant must pursue a plan amendment. In pursuing an amendment, the applicant must show that the proposal is reasonable within the context of the entire Comprehensive Plan."[44]

---

[37] Comprehensive Plan at p. 4.
[38] Comprehensive Plan at p. 5.
[39] Comprehensive Plan at p. 14, § 2.6.
[40] Comprehensive Plan at p. 14, § 2.7.
[41] Comprehensive Plan at p. 14, § 2.8.
[42] Comprehensive Plan at p. 14, § 2.11.
[43] Comprehensive Plan at p. 15.
[44] Comprehensive Plan at p. 6.

107.    In considering amendments to the Comprehensive Plan, the Planning Commission; Lawrence City Commission; and Douglas County Board of Commissioners must consider "how [] the proposed amendment reflect[s] the adjacent neighborhoods' desired outcome?"[45]

108.    The Project does not comply with the Comprehensive Plan, but Savion/Evergy has not sought to amend the Comprehensive Plan.

109.    Kansas law requires that "the planning commission shall review or reconsider the plan or any part thereof and may propose amendments."[46]

110.    But the Planning Commission has not reviewed or reconsidered the Comprehensive Plan since its adoption.

111.    These requirements and the due process they afford are not mere formalities; citizens have relied upon the Comprehensive Plan.

112.    For example, Amber Ross and Josh Peters purchased their home with the goal of opening a rural wedding venue nestled in an oasis of pristine agricultural land. To ensure they made an informed decision and to protect their investment, they studied the planning and zoning regulations of Douglas County and closely studied the Comprehensive Plan. Based on the findings published therein, and the procedural protections detailed above, they not only bought their home and opened Veranda Venue, but also began heavily investing in the property. It wasn't just the beauty of the land that induced this investment, but also the County's commitment to preserving it from sprawling urbanization as set forth in the Comprehensive Plan.

113.    Comprehensive Plans "shall" show "the general location, extent, and relationship of the use of land for…major utility facilities both public and private."[47]

---

[45] Comprehensive Plan at p. 7.
[46] K.S.A. 12-747(d).
[47] K.S.A. 12-747.

114.    But the Comprehensive Plan does not show, discuss, or contemplate power plants in the Valley.

115.    Neither the Planning Commission, the Lawrence City Commission, nor the County Commission has considered an amendment to the Comprehensive Plan to show any solar power plant in the Valley.

Solar Regulations

116.    Savion/Evergy's Application must include "[a] stormwater management plan with supporting calculations, documenting how increased runoff will be conveyed throughout the site. The calculations must include the design of open channels and culverts on site. Based on recommendations from the County Engineer, storage and controlled release points of discharge from the site may be required; if so, **the stormwater management plan must be implemented on the final site plan prior to approval.**"[48]

117.    Savion/Evergy's Application failed to include this information.

118.    Moreover, the stormwater management plan was not implemented on the final site plan prior to the County's approval of the Application.

119.    And although "[p]reliminary stormwater management plans may be provided with the original application, as required by the County Engineer," "engineered or detailed plans must be submitted for the County Engineer's review and evaluation prior to the Board of County Commission's final action on the application."[49]

120.    No engineered or detailed stormwater management plans were submitted to the County Engineer's review and evaluation before the Commissioners voted on the Application.

---

[48] County Code, §12-306-49.06.d.7.
[49] County Code, § 12-306-49.06.d.7.i.

121.    All "[c]hanges required by the stormwater plan, such as detention, shall be shown on the final plans for the Board of County Commission's consideration."[50]

122.    These required changes were not shown on the final plans before the Commissioners' final action on the Application.

123.    The County's Solar Regulations apply to the Project.

124.    Savion/Evergy's Application is required to comply with the Solar Regulations.

125.    The Application fails to comply with the Solar Regulations.

126.    The County does not possess the discretion to exempt the Application from the requirements of the Solar Regulations.

127.    The Planning Commission's review of the Application, despite its failure to comply with the Solar Regulations, renders the Planning Commission's review of the Application invalid.

128.    As a result, the Application has not been properly reviewed by the Planning Commission and the Commissioners lacked jurisdiction to review the Application.

129.    The County's purported approval of the Application when it failed to comply with the Solar Regulations, and when the Planning Commission has not properly reviewed a completed Application, renders the County's purported approval of the Application invalid.

<u>Northeast Sector Plan</u>

130.    The citizens of Douglas County, by and through their elected officials within the City of Lawrence and the County, adopted the Northeast Sector Plan.

131.    The entire Project is located within the Northeast Sector Plan.

---

[50] County Code, § 12-306-49.06.d.7.i.b.

132.    The Northeast Sector Plan was approved by the Planning Commission on May 21, 2012, the County Commission on June 13, 2012, and the Lawrence City Commission on September 11, 2012.

133.    The Northeast Sector Plan was designed to "outline specific land use goals, policies, and recommendations," including "recogniz[ing] that this area is unique in its development potential and the community may benefit most by limited development."[51]

134.    And the Northeast Sector Plan was intended to be binding, with only "[p]roperties with zoning other than Agricultural that seek to develop for a permitted use may do so without oversight of the future land use map of this plan as long as they receive the appropriate approvals to do so."[52]

135.    The FAA also mandates a 10,000-foot Wildlife Mitigation Buffer "meant to keep water bodies and other wildlife attractants to a minimum."[53] This includes the Project area:[54]



---

[51] Northeast Sector Plan at §1.1.
[52] Northeast Sector Plan at §3.2.
[53] Northeast Sector Plan at §2.5.
[54] Northeast Sector Plan at Map 2-16.

136.   "Agriculture uses are located in the majority of the planning area which is not anticipated to urbanize within the foreseeable future. Compared to other areas on the fringe area of Lawrence, this area is not anticipated to be significantly urbanized. Due to the area's unique challenges to development, including costly stormwater infrastructure needs as urbanization occurs; significant amounts of regulatory floodplain, significant amounts of Class 1 and 2 soils, and FAA Regulations and Lawrence Municipal Airport Protection Zones."[55] As a result, the Northeast Sector Plan "proposed only limited urban development in the planning area."[56]

137.   As a result, the Northeast Sector Plan adopted policies, including:

   a.   "Encourage continued agricultural use for the majority of the planning area, especially in areas with Class I and II soils and in the regulatory floodplain areas";[57]

   b.   "Identify and create programs that promote continued agriculture use by supporting existing and new agriculture ventures";[58]

   c.   "Require compatible land uses within FAA guidelines related to runway protection zones and wildlife mitigation";[59]

   d.   "Recognize Class I and II soils as valuable to this portion of Douglas County for its permeability (positive attribute for stormwater and flooding) and crop production capabilities."[60]

---

[55] Northeast Sector Plan at 3.
[56] Northeast Sector Plan at 3.
[57] Northeast Sector Plan at §3.1.1.1.b.1.
[58] Northeast Sector Plan at §3.1.1.1.b.4.
[59] Northeast Sector Plan at §3.1.1.1.c.3.
[60] Northeast Sector Plan at §3.1.2.1.a.1.

    e.  "Encourage the preservation of high quality agriculture land (Class I and II soils) through conservation programs, private/public partnerships, and other funding mechanisms";[61]

    f.  "Encourage private agriculture easements that will preserve high quality agriculture land in perpetuity";[62]

    g.  "Promote the natural and beneficial functions of the floodplain";[63]

    h.  "Encourage natural stormwater management";[64]

    i.  "Crop and animal agriculture uses are appropriate in the regulatory floodplain";[65]

    j.  "Promote land management choices that limit the potential for negative groundwater impacts";[66]

    k.  "Minimize pollutants percolating into groundwater systems to help ensure the quality of the area's groundwater systems";[67]

    l.  "Encourage public/private partnerships and programs to establish and support a sustainable local food program";[68]

    m.  "Establish incentives as part of a local food program that foster farm to table relationships";[69]

    n.  "Support the ag community by creating partnerships and programs that further economic development of an agricultural nature";[70]

---

[61] Northeast Sector Plan at §3.1.2.1.a.2.
[62] Northeast Sector Plan at §3.1.2.1.a.3.
[63] Northeast Sector Plan at §3.1.2.1.b.3.
[64] Northeast Sector Plan at §3.1.2.1.b.4.
[65] Northeast Sector Plan at §3.1.2.1.b.5.
[66] Northeast Sector Plan at §3.1.2.1.c.1.
[67] Northeast Sector Plan at §3.1.2.1.c.2.
[68] Northeast Sector Plan at §3.1.3.1.c.1.
[69] Northeast Sector Plan at §3.1.3.1.c.2.
[70] Northeast Sector Plan at §3.1.3.1.c.3.

o.  "Develop partnerships between Douglas County, Grant Township and the City of Lawrence for appropriate road maintenance programs in the planning area as development occurs";[71]

p.  "The flat terrain in some parts of the planning area hinders storm drainage. Stormwater improvements identified in the North Lawrence Drainage Study should be constructed as development occurs in the area";[72] and

q.  "Implement appropriate stormwater management practices throughout the planning area."[73]

138.   The Northeast Sector Plan contains a future land use map, wherein the entire Project area is designated for agricultural use:[74]



139.   Importantly, no power plant is designated within the Northeast Sector Plan.

140.   Power plants are not discussed in the Northeast Sector Plan.

---

[71] Northeast Sector Plan at §3.1.4.1.a.1.
[72] Northeast Sector Plan at §3.1.4.1.b.2.
[73] Northeast Sector Plan at §3.1.4.1.b.3.
[74] Northeast Sector Plan at Map 3-1.

North Lawrence Drainage Study

141.   The North Lawrence Drainage Study was issued in November 2005. It was the result of the Planning Commission's recommendation "to address repeated flooding concerns from residents of the North Lawrence area."[75] The study determined this flooding is caused by:[76]

a.   "Development that has significantly increased runoff from design storm events";

b.   "Undersized drainage system components such as culverts, drainage channels, underground pipe systems and inlets";

c.   "Siltation within the storm drainage system";

d.   "Past development of flood-prone areas"; and

e.   "A shallow, flat, and interrupted watershed drainage network."

142.   The North Lawrence Drainage Study encompasses the entire Project area.

143.   The North Lawrence Drainage Study found that although the Valley's "natural silt loam soils are highly permeable," "increased development is replacing those soils with nearly impermeable clay material."[77] "In addition, extremely mild slopes across the landform cause frequent ponding and roadway overtopping."[78]

144.   Following its comprehensive study, in part, into "assess[ing] the effects of development in the floodplain," it made "four major recommendations":[79]

a.   "Drainage from north of 24/40 Highway should be cutoff by the highway embankment and the water should be pumped over the levee at a point just east of the 24/40 intersection to reduce the burden on the 2nd Street Pump Station";

---

[75] North Lawrence Drainage Study at p. iv.
[76] North Lawrence Drainage Study at p. vi.
[77] North Lawrence Drainage Study at p. vi.
[78] North Lawrence Drainage Study at p. vi.
[79] North Lawrence Drainage Study at p. iii.

    b.   "Future development in the watershed should maintain the current conveyance levels in the 100-year floodplain—development should not reduce capacity for floodplain storage";

    c.   "The City should purchase parcels of land as necessary for use as dedicated ponding areas"; and

    d.   "Major roads and hydraulic structures should be improved to meet the current APWA criteria with regard to overtopping during the 100-year event, in order to provide adequate emergency services to the area."

145.    "Tens of millions of dollars of cost were identified to accomplish the recommendations of the study for dealing with existing stormwater issues and future ones that will be created with development."[80]

146.    In fact, in 2005 dollars, the recommendations carried a total cost of approximately $41,000,000.00.[81]

147.    As of today, none of these recommendations have been completed.

148.    The County's approval of the Application without completing any of the recommendations from the North Lawrence Drainage Study will exacerbate the issues identified in the study.

149.    Power plants are not discussed in the North Lawrence Drainage Study.

---

[80] Northeast Sector Plan at §2.4
[81] North Lawrence Drainage Study at p. vi.

<u>Food System Plan</u>

150.    The 2017 Food System Plan "was created as part of the process to update the []

Comprehensive Plan and sets a framework for the next 10 years to guide policy changes by our

local governments."[82]

151.    The Food System Plan adopted policies, including:

a.    "utilize the protection of High Quality Agricultural Land as a key assumption in

the sector planning process";[83]

b.    "develop a method to monitor High Quality Agricultural Land protection efforts";[84]

c.    "establish tools to protect High Quality Agricultural Land for farming that are

economically feasible for the land owner";[85]

d.    "develop incentives, regulatory tools, and zoning standards that direct high density

residential and commercial development in incorporated cities and their Urban

Growth Areas" to "encourage protection of agricultural land and support local food

production";[86]

e.    "assess feasibility of an agricultural reserve overlay district to encourage

agricultural land preservation"[87]; and

f.    "seek input of local agricultural producers in planning and zoning matters."[88]

152.    Power plants are not discussed in the Food System Plan.

---

[82] Food System Plan at p. 1 (emphasis in original removed).
[83] Food System Plan, Policy §2.1.1.
[84] Food System Plan, Policy §2.1.2.
[85] Food System Plan, Policy §2.1.3.
[86] Food System Plan, Policy §2.1.4
[87] Food System Plan, Policy §2.1.5.
[88] Food System Plan, Policy §2.1.6.

<u>Open Space Plan</u>

153.   "Douglas County's landscape consists of rich, high-quality (class 1 and 2) soils, climate, precipitation, and terrain that makes it well suited for its principal rural land use—agriculture. This industry is also a major contributor to the county's economy, identity, and way of life."[89]

154.   And the Open Space Plan recognizes the unique value of the Valley to agricultural purposes:[90]



155.   "Agriculture, the principal use in Douglas County, is a major contributor to Douglas County's economy. Maintaining an inventory of productive, or potentially productive, agriculture land is a principal goal within the unincorporated portion of the County. Ensuring continued agricultural production by maintaining health, working lands is important for preserving the local food system, employment opportunities, and local heritage."[91]

156.   Power plants are not discussed in the Open Space Plan.

---

[89] Open Space Plan at p. 35.
[90] Open Space Plan Map 5 at p. 36 (partial of map).
[91] Open Space Plan at p. 59.

<u>The Airport's FAA-Regulated Wildlife Mitigation Zone and Glare Impacts</u>

157.    The Lawrence Municipal Airport is required to maintain a separation distance of 10,000 feet from any wildlife attractant and a 5-mile separation from any wildlife attractant that could cause hazardous wildlife movement into or across the approach or departure airspace.[92] This encompasses the entire Project area:[93]



158.    Power plants in the Valley are not discussed in the Lawrence Municipal Airport Master Plan.

159.    The Project will create wildlife attractants within 10,000 feet of the Lawrence Municipal Airport.

160.    The Project will create wildlife attractants that could cause hazardous wildlife movement into or across the approach or departure airspace within five miles of the Lawrence Municipal Airport.

161.    These new wildlife attractants include, but are not limited to, detention/retention ponds, wetlands, and the solar panels themselves. It is well documented that solar power plants

---

[92] Lawrence Municipal Airport Master Plan at E-2.
[93] Lawrence Municipal Airport Master Plan at Exhibit E-1.

attract birds.[94] As the U.S. Department of Energy explained, "[u]tility-scale" solar power plants "may attract migrating waterfowl and shorebirds through the "lake effect," whereby migrating birds perceive the reflective surfaces of [] panels as bodies of water and collide with the structures as they attempt to land on the panels…Water seeking insects also can be attracted to PV panels which may have an effect on food webs."[95]

162.    FAA Advisory Circular 150/5200-33C, *Hazardous Wildlife Attractants on or near Airports* "provides guidance on certain land uses that have the potential to attract hazardous wildlife on or near public-use airports.[96] "[A]ircraft collisions with birds and other wildlife are a serious economic and public safety problem."[97] "[W]ildlife-aircraft strikes have resulted in the loss of hundreds of lives worldwide, as well as billions of dollars in aircraft damage."[98]

163.    "Airports that have received Federal assistance are required under their grant assurances to take appropriate actions to restrict the use of land next to or near the airport to uses that are compatible with normal airport operations. The FAA recommends that airport operators oppose off-airport land-use changes or practices…which may attract hazardous wildlife. Failure to do so may lead to noncompliance with applicable grant assurances."[99]

164.    The Lawrence Municipal Airport has received Federal assistance.

---

[94] U.S. Fish & Wildlife Service, Incidental Take Beneficial Practices: Solar, *available at* https://www.fws.gov/story/incidental-take-beneficial-practices-solar; California Energy Commission, Investigating the "Lake Effect" Influence on Avian Behavior from California's Utility-Scale Photovoltaic Solar Facilities, *available at* https://www.energy.ca.gov/publications/2024/investigating-lake-effect-influence-avian-behavior-californias-utility-scale.

[95] U.S. Department of Energy, Literature review on impacts to avian species from solar energy collection and suggested mitigations, *available at* https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.energy.gov/sites/prod/files/2019/03/f61/Hathcock%25202018.pdf&ved=2ahUKEwiKwdma8N6GAxVql4kEHe6CBZAQFnoECBcQAQ&usg=AOvVaw0htQnsMwdsNk8YUQt45q9j.

[96] AC 150-5200-33C at p. i.

[97] AC 150-5200-33C at p. ii.

[98] AC 150-5200-33C at p. iii.

[99] AC 150-5200-33C at §4.3.4.

165.    "Increasing the intensity of wildlife control efforts is not a substitute for preventing, eliminating or reducing a proposed wildlife hazard."[100]

166.    And after recognizing there is interest in solar energy systems near and on airports, the FAA issued a formal policy, published in the Federal Register.[101] In it, the FAA explained solar panels "can reflect sunlight and produce glint (a momentary flash of bright light) and glare (a continuous source of bright light)."[102] And "[t]hough this policy does not apply to proponents of solar energy systems located off airport property," the FAA still recommended the consideration of ocular impact from proposed systems.[103]

167.    The Application contains FAA approval based solely on height.

168.    The Application does not contain FAA approval based on glint or glare.

169.    And there is documented concern of glare to the Lawrence Municipal Airport.

170.    Although the County failed to obtain input from the Lawrence Municipal Airport's Aviation Advisory Board, one of its members took it upon himself to review the plans and analyze whether it may pose a concern for the airport. Unsurprisingly, the concern was glare. Specifically, panels located in the following double red lined triangle:



---

[100] AC 150-5200-33C at §4.3.4.
[101] FAA Policy: Review of Solar Energy System Projects on Federally-Obligated Airports, 86 Fed. Reg. 25801 (May 11, 2021).
[102] *Id.* at 25802.
[103] *Id.*

171.    Solar panels in this section risk glare problems for pilots on final approach landing to the south on Runway 15 or taking off and departing to the north on Runway 33:



172.    This issue has not been studied. The FAA has not been consulted or asked to opine on this issue. The Lawrence Municipal Airport's Aviation Advisory Board has not been consulted or asked to opine on this issue. The City of Lawrence has not been consulted or asked to opine on this issue. The County has not analyzed, studied, *or even considered* this issue.

<u>The Code's Maple Grove Stormwater Management Standards</u>

173.    The Project is located within the Maple Grove Watershed.

174.    All CUPs located within the Maple Grove Watershed must meet the County's Maple Grove Stormwater Management Standards.[104]

175.    The Maple Grove Stormwater Management Standards are lawful regulations that were properly enacted by the County.

176.    The Maple Grove Stormwater Management Standards apply to the Application.

177.    The Application must comply with the Maple Grove Stormwater Management Standards.

178.    When approving the Maple Grove Stormwater Management Standards, the then-Commissioners were concerned about large-scale development in the Valley; but, the County

---

[104] County Code, § 9-112.a.

Engineer assured the County's elected officials: "The good thing is it would be very hard to do large-scale infiltration…This standard will be tough."

179.    The Application fails to comply with these regulations.

180.    For example:

a.    The site plan fails to include stormwater storage basis to hold and retain the increase in runoff volume generated by the development, estimated for the 100-year, 24-hour design storm;[105]

b.    The existing and proposed runoff volumes are not estimated using HEC-HMS, with a frequency-based storm event and precipitation data from NOAA Atlas 14;[106]

c.    The existing and proposed runoff curve numbers are not estimated from land use and hydrologic soil group, as outlined in NRCS TR-55;[107]

d.    The retained runoff is not infiltrated into the ground within 96 hours;[108]

e.    No outlets are provided to empty the storage basin in not less than 72 hours, nor are small pipe outlets or weirs controlling the discharge rate from the basin;[109]

f.    The entire developed site does not drain to the storage basin(s);[110]

g.    The storage basin(s) and site are not graded to manage all runoff and prevent flooding of structures or adjacent property;[111]

h.    The site plan fails to report the dimensions and areas of the proposed storage basin(s) and the type of grass to be planted in and around the basin;[112]

---

[105] County Code, § 9-112.b.
[106] County Code, § 9-112.c.
[107] County Code, § 9-112.c.
[108] County Code, § 9-112.d.
[109] County Code, § 9-112.e.
[110] County Code, § 9-112.f.
[111] County Code, § 9-112.g.
[112] County Code, § 9-112.h.

     i.   The site plan lacks the note that "the infiltration basin has been designed to capture the added runoff volume generated by new impervious surfaces. The required storage volume is located below the point of outflow leaving the site";[113] and

     j.   The site plan lacks the note that "the landowner will maintain the storage and infiltration capacity of the basin. The landowner will remove sediment, and till or cultivate the basin floor as needed to restore adequate infiltration rates."[114]

181.    Nevertheless, on April 30, 2024, the County publicly announced that the County did not require the Application to comply with the Maple Grove Stormwater Management Standards, stating, in full, "[t]he scale of this project will require a completely different technical approach."

182.    The County does not possess the discretion to exempt the Application from the requirements of the Maple Grove Stormwater Management Standards.

183.    The Planning Commission's review of the Application while it failed to comply with the Maple Grove Stormwater Management Standards renders the Planning Commission's review of the Application invalid.

184.    As a result, the Application has not been reviewed by the Planning Commission and the Commissioners lacked jurisdiction to review the Application.

185.    The County's purported approval of the Application while it failed to comply with the Maple Grove Stormwater Management Standards, and the Planning Commission having not properly reviewed the Application, renders the purported approval of the Application invalid.

---

[113] County Code, § 9-112.i.
[114] County Code, § 9-112.j.

Federal and Kansas policies support the Valley's use for farming

186.    The Kansas Legislature has codified "the declared policy of this state to conserve and protect and encourage the development and improvement of farmland for the production of food and other agricultural products."[115]

187.    Consistent with that public policy, agricultural activities conducted on farmland are presumed to be reasonable.[116]

188.    Similarly, Congress has determined:

  a.    "the Nation's farmland is a unique natural resource and provides food and fiber necessary for the continued welfare of the people of the United States";

  b.    "each year, a large amount of the Nation's farmland is irrevocably converted from actual or potential agricultural use to nonagricultural use";

  c.    "continued decrease in the Nation's farmland base may threaten the ability of the United States to produce food and fiber in sufficient quantities to meet domestic needs and the demands of our export markets"; and

  d.    "the extensive use of farmland for nonagricultural purposes undermines the economic base of many rural areas."[117]

189.    Thus, both the Federal Government and the State of Kansas have declared that farmland—and especially the Class 1 and Class 2 soils in the Valley—must be protected and cannot be allowed to be converted to non-agricultural use.

190.    Power plants on farmland are not discussed in either the Kansas Right to Farm Act or the Farmland Protection Policy Act.

---

[115] K.S.A. 2-3201.
[116] K.S.A. 2-3202.
[117] 7 U.S.C. 4201(a).

**The Commission's Expressed Intent to Violate its Supermajority Vote Requirement by Piecemealing its Decisions**

191.   Ordinarily, the Commission can approve a CUP by a simple majority vote.[118]

192.   However, a two-thirds majority vote is required if the Commission attempts to act contrary to the Planning Commission's recommendation.[119]

193.   Here, the Planning Commission recommended denying the Application.

194.   And when a valid protest petition has been submitted in accordance with § 12-307-2.03, a three-fourths majority vote is required if the County Commission attempts to approve a CUP or approve a CUP with conditions or modifications.

195.   Here, such a valid protest petition was filed.

196.   As a result, the Commissioners can only approve the Application (even if with conditions or modifications) by a unanimous vote of the three Commissioners.

197.   As detailed elsewhere, the Commissioners' purported vote was improper because all of the required attachments, decisions, and filings were not submitted at the time the Commissioners voted on the Application.

198.   The County has declared that this purported vote absolved any further unanimous vote requirements.

199.   In other words, when the requirement documents, decisions, and filings are later submitted—including a road agreement with Grant Township and a stormwater plan—the County has declared that those votes do not require a unanimous decision.

200.   Upon information and belief, this was intentional and designed to circumvent the Planning Commission's denial and the protest petition's impacts on voting requirements. By

---

[118] County Code, § 12-307-2.07.c.
[119] County Code, § 12-307-2.07.c.1.

piecemealing its votes and serially approving portions of the Application (despite being requirements from the outset), the County will avoid its unanimous decision-making requirement.

201.    The County lacks the authority to avoid its unanimous decision-making requirement.

202.    The County's declared intent on voting violates Plaintiffs' due process and statutory rights.

203.    The County fully acknowledges that the Application continues to materially change. For example, during the Commissioners' Special Meeting on April 13, 2024, Commissioner Kelly stated, "This process isn't over…We have a very different application here in front of us now due to all the conditions." Separately, Planning Commissioner Rexroad has acknowledged that the Planning Commission's vote was based on incomplete plans: "If the stormwater plan comes back and in any way represents risks to North Lawrence, or anywhere, that is a hard stop. That is my understanding. It is a hard stop at that time."[120]

204.    The lack of a complete stormwater plan before the Planning Commission's vote, let alone the Commissioners, renders the purported vote improper.

205.    Compounding this due process violation, on November 8, 2022, voters—by a margin of roughly 61% to 39%—called for the power of each Commissioner to be significantly reduced; expanding the Board of Commissioners from three to five.[121] On December 21, 2022, Commissioner Willey voted against holding a special election to fill the two additional seats.[122] At

---

[120] Planning Commission chair says more work is needed on flooding concerns related to solar project; he urges North Lawrence to have a voice, April 9, 2024, *available at* https://www2.ljworld.com/news/county-government/2024/apr/09/planning-commission-chair-says-more-work-is-needed-on-flooding-concerns-related-to-solar-project-he-urges-north-lawrence-to-have-a-voice/.

[121] Douglas County Commission approves slightly modified 5-district map; no special election to fill new seats, December 21, 2022, *available at* https://lawrencekstimes.com/2022/12/21/dgcocomm-approves-map/.

[122] *Id.*

the public hearing, citizens voiced their frustration with the self-serving decision, calling it a deliberate attempt to "thwart the will of the people," so that the Commissioners could "preserve your little fiefdoms and your power for an extra two years."

206. This piecemealing and piece-by-piece approval of the Application also frustrates judicial review. What "decision" has actually been made? What evidence and facts did the County rely upon? Permitting this kind of conduct frustrates a court from *ever* adequately reviewing a County decision, because the review becomes whack-a-mole. Such conduct should be estopped.

**The County Attempts to Paper Over Their Unreasonable Actions**

207. The County was served with the original Petition in this action on May 13, 2024.

208. On May 17, 2024, the County published an Agenda Item Report regarding "Resolution No. 24-14 granting a Conditional Use Permit for the Kansas Sky Energy Center; and Findings of Fact."[123]

209. The Agenda Item Report identifies the author of the document as "Legal Counsel based on the decision of the County Commission."

210. However, the Agenda Item Report makes representations and claims that vastly expands beyond the minimal (and controvertible) statements made by Commissioners during the April 13, 2024, Special Meeting that the Commissioners, without the careful writing of its lawyers, disclosed the basis of the County's decision.

211. Moreover, the proposed Findings of Fact were updated and redlined prior to the Board of Commissioners' May 22, 2024, meeting. Upon information and belief, these redlines were requested by Commissioner Willey to inflate the nonexistent promises around agrivoltaics.

---

[123] *Available at* https://douglascountyks.civicweb.net/document/130218/Resolution%20No.%2024-14%20granting%20a%20Conditional%20Use.pdf?handle=ECFB71046FF544FAB8865A7BC74AFC18.

212.     Planning Commissioner Rexroad road mapped the strategy of papering over the County's unreasonable decision: "If I were a county commissioner—and thank God I'm not—one of the things I would say coming out of that [Saturday meeting] is that I want to ensure that North Lawrence's concerns are reflected and I want them to sign off or give input to a stormwater plan that [the County] is going to approve. I absolutely would do that."[124]

213.     The Board of Commissioners voted on the Agenda Item Report at its May 22, 2024, Regular Meeting.

214.     This Petition is filed within 30 days of that decision.

### The Board's Action was Unreasonable

215.     In considering the Application, the County was engaged in a quasi-judicial proceeding.[125]

216.     Thus, the County was required to comply with the requirements of due process, including fair, open, and impartial proceedings.[126] "[A]nd if such requirements are denied, the resulting action is void."[127]

217.     Prejudgment by a Commissioner, especially where a Commissioner fails to keep an open mind and listen to all of the evidence presented before making a decision, violates Plaintiffs' due process rights.[128]

---

[124] Planning Commission chair says more work is needed on flooding concerns related to solar project; he urges North Lawrence to have a voice, April 9, 2024, *available at* https://www2.ljworld.com/news/county-government/2024/apr/09/planning-commission-chair-says-more-work-is-needed-on-flooding-concerns-related-to-solar-project-he-urges-north-lawrence-to-have-a-voice/.
[125] *McPherson Landfill, Inc. v. Bd. of Cnty. Comm'rs of Shawnee Cnty.*, 274 Kan. 303, Syl. ¶ 2, 49 P.3d 522 (2002).
[126] *McPherson* 274 Kan. at Syl. ¶ 2.
[127] *Tri-Cnty. Concerned Citizens, Inc. v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 32 Kan. App. 2d 1168, Syl. ¶ 5, 95 P.3d 1012 (2004).
[128] *McPherson*, 274 Kan. at Syl. ¶ 4.

218.    *Ex parte* communications between an applicant and the County increases the likelihood that Plaintiffs' due process rights were violated.[129]

219.    If the County violated Plaintiffs' due process rights, the resulting decision to approve the Application is void.[130]

220.    Although public opposition is not legally sufficient to deny a CUP, it is a consideration in the ultimate decision and the decision must consider the benefit ***or harm*** to the community at large.[131]

221.    Moreover, aesthetic consideration is a valid factor to be considered in a zoning decision.[132]

<u>The Board's Unreasonable Action Violates the *Golden* Factors</u>

222.    The Kansas Supreme Court, in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978) enumerated eight factors that a zoning body, like the County, should consider when making a decision, like whether to approve the Application. *Id.* at 598.

223.    However, the Court maintained flexibility, holding the list was not exhaustive and other factors may be important in a particular case. *Id.* at 599.

224.    Although formal findings and conclusions from the County are not required when making a zoning decision, *Bd. of Cnty. Comm'rs of Johnson Cnty. v. City of Olathe*, 263 Kan. 667, 678, 952 P.2d 1302 (1998), such a written order summarizes the evidence before it, states the factors considered in arriving at the zoning decision, and permits a reviewing court to understand the basis for the action taken. *Golden*, 224 Kan. at 591; *Davis v. City of Leavneworth*, 247 Kan. 486, 493, 802 P.2d 494 (1990). It is not an advocacy piece, but rather unbiased reporting.

---

[129] *McPherson*, 274 Kan. at Syl. ¶ 5.
[130] *McPherson*, 274 Kan. at Syl. ¶ 2.
[131] *R.H. Gump Revocable Tr. v. City of Wichita*, 35 Kan. App. 2d 501, 511, 131 P.3d 1268 (2006).
[132] *R.H. Gump Revocable Tr.*, 35 Kan. App. 2d at 512.

225.     The County adopted such a written order on May 22, 2024 ("Findings of Fact").

226.     The Court may rely upon the County's Findings of Fact as the exclusive facts relied upon by the County in reaching its decision.

227.     The County is estopped from attempting to circumvent, disavow, or contradict any statement (or lack of statement) made in its written Findings of Fact. The Court is empowered to draw inferences of bias and motive where the County omits facts, selectively applies facts, or misanalyses the *Golden* factors to support the County's conclusion.

228.     That happened here. The County's Findings of Fact omits all of the evidence that does not support the County's decision, selectively applies certain evidence, fundamentally misunderstands fundamental facts surrounding the Application, and misanalyses the *Golden* factors. As a result, the County's Findings of Fact expressly evidences the unreasonableness of the County's decision in approving the Application.

229.     To assist the Court, each *Golden* factor is analyzed below.

*The neighborhood's agricultural and residential character*

230.     The County's Findings of Fact claims this factor weighs in favor of approval of the Application:

> "Because the land under the solar panels will not be completely removed from agricultural use, parts of the use continue to fit within the agricultural character of the area. In addition, because the surrounding area includes other industrial and commercial uses, the primary use under the CUP, that of industrial solar, also fits within the character of the neighborhood."[133]

231.     These allegations are false.

232.     First, nothing in the Application requires any land under the solar panels to be reserved for agricultural use.

---

[133] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 20.

233.    Moreover, the Application does not contain "agrivoltaics." "Agrivoltaic systems elevate ground mount solar arrays so that people, equipment, and animals can traverse underneath the arrays for crop and livestock cultivation."[134] The Application limits the height of the solar arrays and they are "approximately 18 inches" off the ground.[135] This design will not allow for agrivoltaics dual-use. Photographs of legitimate agrivoltaics make the contrast apparent:[136]



234.    Indeed, the Vegetation & Agrivoltaics Management Plan represents that "low growth, low maintenance, shade tolerant grasses and forbs for areas under panels and between panel rows."[137] "The installation of low-growing plant species and performance of vegetation management practices within the PV panel areas will be conducted to minimize vegetation touching or shading the panels" that have a "leading-edge height between the PV panels and the ground" of "approximately 18 inches."[138]

---

[134] New Haven, CT: Yale Center for Business and the Environment, Agrivoltaics: Producing Solar Energy While Protecting Farmland (Oct. 26, 2021), *available at* https://farmlandinfo.org/publications/agrivoltaics-producing-solar-energy-while-protecting-farmland/.
[135] Vegetation & Agrivoltaics Management Plan at p. 6 (8/17/23).
[136] Agrivoltaics: Producing Solar Energy While Protecting Farmland (Oct. 26, 2021).
[137] Vegetation & Agrivoltaics Management Plan at p. 7 (8/17/23).
[138] Vegetation & Agrivoltaics Management Plan at p. 6 (8/17/23).

235.    This matches the CUP's Post-Construction Vegetation Map, which lacks *any* agricultural use:



236.    To avoid any doubt that no agricultural use will be permitted under the solar panels, the Application lists the grasses, sedges, and rushes (60-90% of weight) and forbes (10-40% of weight) within the Mesic-Moist Short Mix used near the panels. None of these seeds are harvestable agricultural crops. And these areas will be subject to indefinite mowings to control "weed growth and minimize vegetation height under the PV panels."[139]

237.    Second, the County's Findings of Fact claims, "the primary use under the CUP" is similar to the area's "other industrial and commercial uses." As addressed in the following *Golden* factor, this simply is not true. "Industrial" and "commercial" only comprises 3% of the land use—and that's after combining "industrial" with "warehouse" *and* "distribution."[140] Ranked, in order of most prevalent, the land uses in the area are:

    a.   Agricultural: 72%

---

[139] Vegetation & Agrivoltaics Management Plan at p. 19 (8/17/23).
[140] Northeast Sector Plan, Table 2-1.

      b.  Parks/Rec/Open Space: 10%

      c.  Transport/Communication/Utility: 6%

      d.  Single Family Residential: 5%

      e.  Vacant Residential: 2%

      f.  Commercial: 2%

      g.  Industrial/Warehouse/Distribution: 1%

      h.  Public/Institutional: 1%

      i.  Residential – Other: 1%

238.    There is no power plant in the Valley. Therefore, the Application's 1,100-acre power plant *cannot* "fit within the character of the neighborhood."

239.    Moreover, the staff report utilized a "neighborhood" that is miles larger than it should have been, in order to skew the metric. For example, the County defined the "neighborhood" as including large areas outside of Grant Township and even the Valley. The staff report goes so far as to include the coal plant and industrial operations *on the other side of the river*.

240.    Because the basis of the County's decision, as it relates to the character of the neighborhood are false, the County's decision is unreasonable.

<u>*Nearby properties' agricultural and residential zoning and use*</u>

241.    The County's Findings of Fact claims this factor weighs in favor of approval of the Application because:

> "The zoning and uses of the nearby land includes agricultural, industrial, and commercial uses."[141]

---

[141] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

242.    These allegations are false.

243.    The County's own Northeast Sector Plan directly contradicts this claim: [142]

TABLE 2-1:  EXISTING LAND USE SUMMARY

| Land use | Acres | Percent |
|---|---|---|
| Agricultural | 7,330 | 72% |
| Single Family Residential | 550 | 5% |
| Vacant Residential | 232 | 2% |
| Residential - Other | 72 | 1% |
| Commercial | 186 | 2% |
| Industrial/Warehouse/Distribution | 125 | 1% |
| Public/Institutional | 110 | 1% |
| Parks/Rec/Open Space | 956 | 10% |
| Transport/Communication/Utility | 555 | 6% |
| TOTAL | 10,116 | 100% |

244.    At the time of the Northeast Sector Plan, there were more acres of *vacant* residential than either industrial or commercial.

245.    These percentages are skewed when applied to the Application because the Northeast Sector Plan's planning area boundary is 10,640 gross acres and includes large swaths of area relatively distant from the Project Area. Nevertheless, the Northeast Sector Plan shows that the County's determination of what constitutes "nearby properties" is simply false, rendering the decision unreasonable.

246.    Moreover, under this factor, the County should have considered road studies to determine whether or not the current infrastructure could handle the increased traffic and, if so, what improvements were required to prevent degradation and accidents. This was not done. For example, the County intends for construction traffic to exit at "Midland Bend." This hazardous curve is the most dangerous intersection in Grant Township, notorious for accidents and fatalities. But the County failed to conduct any traffic study of the intersection to determine whether their traffic plan was reasonable.

---

[142] Northeast Sector Plan, Table 2-1.

247.    Meanwhile, where the County did conduct traffic studies, it selected intersections for the constructional haul route where traffic studies were not conducted.

*The subject properties' unique suitability for agriculture*

248.    The County's Findings of Fact claims this factor weighs in favor of approval of the Application because:

> "The land is suitable for the agricultural use to which it has been restricted. Portions of the land the proposed solar facility would be located on contain Class 1 and [Class] 2 soils and are considered prime farmland. However, the commissioners are encouraged by the agrivoltaics plan that would allow for dual use of the land, which will include agricultural uses around and under the solar panels. The land is also suitable for the proposed use due to the level grade and does not have significant environmentally sensitive features that would be affected by the use."[143]

249.    These allegations are false.

250.    All of the area within the Application is zoned for agricultural use. And this alluvial land is particularly valuable agricultural land. In fact, the Valley contains the most fertile land within Douglas County.

251.    The first sentence of the County's Findings of Fact acknowledges that this factor weighs in favor of denying the Application.

252.    But then the County's Findings of Fact claims "the commissioners are encouraged by the agrivoltaics plan that would allow for dual use of the land, which will include agricultural uses around and under the solar panels." As addressed elsewhere, this claim regarding agrivoltaics is simply false.

253.    More importantly to this factor, dual use of the land is entirely immaterial to this factor under *Golden*. This factor is solely focused on "the suitability of the property for the uses to

---

[143] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

which it is restricted." As the claim by the County shows, the properties are *uniquely* suited for agricultural use. As a result, this factor weighs strongly in favor of denying the Application.

254.    The County's refusal to acknowledge this obvious reality is further evidence of the unreasonableness of its decision. Rather than analyzing the Application in its quasi-judicial role, the Commissioners served as the Application's advocates. This, and its plain bias, renders the decision unreasonable and therefore void.

255.    The facts of this case stand in stark contrast to *Combined Inv. Co. v. Bd. of Cnty. Comm'rs of Butler Cnty.*, 227 Kan. 17, 30, 605 P.2d 533 (1980), where the Kansas Supreme Court determined that the subject land was "unsuitable for some agricultural purposes due to outcroppings of rock," and therefore "[t]he highest and best use is undoubtedly for quarrying; the underlying rock is said to have an estimated value of $16,500,000."

256.    Here, the highest and best use (indeed, the most valuable use) of the subject property—agriculture—is precisely what the County's action will eliminate.

257.    The reality that a power plant should not be placed in the middle of the best available agricultural land is not unique to Douglas County. In fact, the Connecticut Departments of Energy and Environmental Protection and of Agriculture published draft Guidance for Siting Solar on Agricultural Land in August 2023. In it, the joint Departments stated:[144]

    a.    "The CT Department of Agriculture recommends siting solar on non-farmland, agricultural infrastructure and unclassified farmland soils not currently in production or fallow field(s) that have been previously disturbed prior to siting solar on classified farmland containing prime, statewide, and locally important farmland soils";

---

[144] Connecticut Department of Energy and Environmental Protection & Connecticut Department of Agriculture, Draft Guidance for Sitting Solar on Agricultural Land, August 2023.

b. "Solar installations should be strategically designed, installed, and operated to maintain agricultural productivity and soil quality";

c. "Placing solar on agricultural land, especially farmland classified as having prime, statewide, or locally important farmland soils, should be avoided"; and

d. Where a solar power plant is over 2 megawatts in size [the Project is 159 megawatts] and may merely "impact" prime farmland [let alone be placed *on* prime farmland], the project must obtain a "Certificate of Environmental Compatibility and Public Need" *and* (i) should not interfere with the continued use of the land beneath the canopy for agricultural purposes; (ii) the height and spacing of panels should accommodate crop-specific needs for sunlight, farm machinery, and worker accessibility; (iii) rows between panels should be made as wide as necessary to accommodate the current agricultural use; and (iv) installing solar on land that would displace farmers who are renting/leasing the land should be avoided.

258.     The Project violates all of these requirements.

259.     Further evidencing the County's bias and advocacy for the Application, the County's Findings of Fact then claim, "[t]he land is also suitable for the proposed use due to the level grade and does not have significant environmentally sensitive features that would be affected by the use." This is immaterial. And it shows either a failure to properly consider this *Golden* factor, or an intentional attempt to manipulate the factor into support for the County's biased decision-making. This too shows that the County's decision is unreasonable.

### *The detrimental affect to nearby properties caused by the CUP*

260.     The County's Findings of Fact claims this factor weighs in favor of approval of the Application because:

"Removal of the restriction could detrimentally affect nearby properties. The commission acknowledges this use could negatively impact the event and wedding venue. There would also be a negative visual impact, but the applicant proposes to mitigate this impact through screening. The proposed use is not expected to have a negative impact on the natural environment but rather would contribute to reducing greenhouse gases to improve the natural environment."[145]

261. These allegations are partly true, but miss large swaths of the problem with the Application.

262. The County's Findings of Fact "acknowledges this use could negatively impact the event and wedding venue." This is in reference to Plaintiff Ironstone Events, LLC (doing business as Veranda Venue), which is owned by Plaintiff Joshua Peters and Plaintiff Amber Ross.

263. Veranda Venue and its owners have been, and will continue to be, damaged by the Application.

264. As a result of the mere filing of the Application, Veranda Venue and its owners have seen a drop in conversion from leads to bookings, and a significant drop of bookings for 2025. Currently, Veranda Venue has only secured 38% of its 2025 bookings. There are multiple elements of the Application that cause this damage to a wedding and event venue.

265. First, the aesthetic impact. The visual appeal of the fairy book venue is the business' key selling point. The installation of a 1,000-acre power plant and associated infrastructure around this venue will forever alter the scenic beauty of the property. This, in turn, makes the unique venue less attractive to potential clients who seek a picturesque location for their wedding. Power plants are not magnets for wedding venues, and for good reason. They visually clash with the romantic and idyllic image Veranda Venue seeks to portray, and will continue to drive clients to seek other wedding venues.

---

[145] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

266.    Second, the noise and disruption during installation. The construction/installation of the power plant will cause significant noise and disruption. This will affect the serene and peaceful environment that potential clients expect *on their wedding day*. Moreover, this noise during tours of the venue discourages bookings. For someone planning an event they want to make permanent memories of, even temporary disturbances create lasting negative impressions.

267.    Third, accessibility. Whether during a tour or during an event, construction traffic and its increased dust, noise, and interference can and will discourage bookings. Road closures are possible. Restricted access to roads. Degraded roads. All of these are factors potential clients will consider when booking their wedding, and are factors sure to exist with the construction of a power plant of this scale.

268.    None of this is surprising to the County, who received a written submission from Veranda Venue, Amber Ross, and Josh Peters. In it, they advised the County that **they have already lost bookings** because of *fear* the Project would be approved. That damage will be compounded now that the Project is purportedly approved.

269.    But Veranda Venue is not the only property or citizen negatively impacted by the Application. Plaintiffs are each faced with unique and differing negative impacts because of the County's decision.

270.    For example:

a.    Plaintiff Grant Township is negatively impacted by the lack of transparency and the piecemeal approach improperly taken by the County.

  i.    Despite being uniquely impacted by the Application, the County has failed to communicate with Grant Township or include it in decision-making processes that needed, whether by the County Code or practicality, to be worked out

55

prior to approval of the Application. This includes, but is not limited to, a Road Maintenance Agreement, which cannot be considered until the Stormwater Plan is finalized first.

ii.   Grant Township is also aggrieved by the failure of the County to require the improvements identified in the North Lawrence Drainage Study prior to the consideration of any further development of Grant Township.

iii.   Underpinning all of these issues is the need for the County and Savion/Evergy to fund these projects. This is not a burden that either should or can be borne by Grant Township. This includes the increase in annual emergency and fire protection costs for the Project's assets and areas that will be charged to Grant Township by the City of Lawrence. Compounding the problem, the County has stated it will misclassify the Project for tax purposes, meaning that Grant Township will only receive increased property taxes of roughly $25,000 per year, because nearly *half* of the entire Project Area will be improperly classified as agricultural (generating no additional income). This $25,000 figure is the financial equivalent of the material cost (not the associated labor) for less than three miles of the Township's nearly 30 miles of roads. As a result, the Project will *reduce* Grant Township's tax revenue for at least the first ten years, further injuring Grant Township's ability to manage and provide for its citizens with soaring infrastructure needs caused by the Project.

iv.   These problems are not speculative; Grant Township is already experiencing them due to the County's temporary use permit for Southern Star's natural gas pipeline. The County approved that permit without requiring a formal

road maintenance agreement with Grant Township. As a result, Grant Township was left with extensive damage to its roads that has taken nearly $100,000.00 of the Township's limited funds to repair. Neither Southern Star nor the County have stepped up to assist in resolving this dispute or requiring financial reparations from Southern Start for the damage it caused. The County has set this Application up for the exact same damage to Grant Township, albeit at a massively larger scale of destruction.

v. Grant Township is also aggrieved by the County's refusal to consider concerns about its citizens' safety and wellbeing. For example, many citizens of Grant Township are reliant upon well water. The County has refused to consider, or even have unbiased evaluation of, the potential harm caused by the Project's intent to drive over 141,000 piers directly into the alluvial aquifer wells used for water. Similarly, Grant Township will be severely impacted by an increase in significant stormwater flooding. Nor has the County taken into consideration the safety of Grant Township citizens, who will drive on roads that will see increased wildlife (particularly deer) who, due to miles of fencing surrounding the Project, will be forced out of their existing habitat and onto roadways as they search for food, shelter, and water. This also extends to the Project itself. There will be an extreme increase in construction traffic and, pursuant to the conditions adopted by the County, the likelihood of construction *every single day of the week*, and, most likely in winter months, significant light pollution caused by artificial light sources.

vi.   Grant Township is also aggrieved through the huge loss of the livelihood of its farming constituents who currently lease and farm the land being taken for the Project, as well as neighboring farmers whose crops will be damaged by hungry wildlife displaced by the Project, stormwater runoff, and overspray from the necessary herbicide spraying to kill weeds that might shade the power plant's solar arrays.

vii.   The County approved this CUP with willful disregard for the safety and wellbeing of Grant Township's citizens, property, and livelihoods. The County ignored the extensive negative physical impact the Project will have on Township roads and flooding from identified but unaddressed stormwater issues. The County failed to specify and require necessary funding for the significant and harmful impacts the Township will bear because of this Project.

b.   Plaintiff Pines International ("Pines") is an FDA inspected USDA farm operation with a processing facility and dehydration plant within the Valley. Over its 44-year history in Douglas County, it has contributed over $120,000,000 in tax generating revenue to the County. Pines is a family-based company that farms over 500 acres, of which 90 acres borders the Project. If these 90 acres are compromised and crop ruined, Pines will experience a direct revenue loss of $2,281,513.69 *every year*.

i.   <u>Wildlife Contamination</u>. Currently, Pines already feels the effects (and financial loss) of the Valley's large whitetail deer population. However, given the vast area of potential foraging, these effects are not concentrated to any single field and are minimal. However, the Project will remove over 700 acres

of wildlife feed sources, putting massive pressure (and financial loss) onto Pines' extensive fields of wheatgrass. These losses are not just reduced crop yields from wildlife feeding. Pines also faces entire seasons of crop loss due to increased pathogenic pressure, which is of the utmost importance to Pines and its FDA inspectors. Pathogens created by wildlife feces can easily spread through crops being processed by Pines and contaminate its entire closed loop system. Pines' products are harvested within a one-week window, and test results sometimes take weeks. Pines would require 3.36 miles of fencing to protect its cropland from wildlife pressures, at an estimated expense of $522,000.

ii. <u>Drainage</u>. As a large-scale farming operation in the Valley, Pines understands its drainage issues well, due in part to the area's aged drainage infrastructure. Despite repeated complaints and extensive studies, the County has never taken the necessary remediations and investments in the Valley to remedy the problem. Today, county drainage ditches often back up into Pines' fields, creating standing water that causes crop loss. The Project will create the largest loss of permeable surface in the Valley since the airport was constructed—and this will only exacerbate a frail and undersized drainage system in the Valley.

iii. <u>Water Quality</u>. Because of its production of human-grade food products, all of Pines' products are extensively tested for heavy metals contamination. The over 140,000 piers required by the Project will be driven directly into (or practically into) the Valley's water table. Given the corrosive nature of the

Valley's soils, Pines is particularly concerned about the eventual contamination of groundwater supply. For those in the Valley, the water table is readily accessible. Consider, for example, the following photograph, showing a freshly dug hole that has already started filling with water from the shallow water table:



iv.  <u>Comprehensive Plan Reliance</u>. Pines has also continued to invest in the Valley based upon the representations made by the County, in part, through the Comprehensive Plan. Based on its reliance on the Comprehensive Plan and its intent to purchase more Valley land,-Pines invested $1,200,000 into its facilities in 2010. And after the current Comprehensive Plan was adopted and reaffirmed the County's commitment to agriculture in the Valley, Pines invested nearly another $1,000,000 in 2013.

c.  Plaintiff Dorance Little ("Little") will face drainage and stormwater damage resulting from the power plant. He has spent thousands of dollars of his own money on equipment rental, fuel, and countless hours to clean and maintain Grant Township's drainage canal and tributaries. Yet, with the Project's construction,

increase in stormwater runoff, and lack of designated agricultural crops, this work will be wasted. Plaintiff Little is also concerned about future contamination of his well water. Having lived almost his entire life in the same location, Plaintiff Little has experienced prior contaminations and understands their cost, disruption, and harm.

d.  Plaintiffs Marc Wilborn and Susan Wilborn purchased their 80-acre farm in December 2011 with the long-term intention to retire to the property. Since clearing the land for their barn in 2012, they have planted over 1,000 pecan and hardwood trees and removed over 500 invasive[146] eastern red cedar trees. They operate Plaintiff Lazy Susan Farms, LLC, on the land. Plaintiffs Wilborns intended to begin building their retirement home on their property. They engaged an architectural firm and began the process of designing a home that would fit into the surrounding landscape and support their vision of their farm. As the power plant became public, the Wilborns slowed their design and construction of their retirement home on their land. Following the County's approval, notwithstanding public criticism and pleas to preserve such irreplaceable soil, the Wilborns have made the demoralizing decision not to build their dream home on their dream farm in the Valley. Not only were the Wilborns' retirement plans impacted by the County's decision, but they are concerned with the devaluation of their property due to its proximity to this industrial power plant. The Wilborns have already invested significant sums of money into the design of their never-to-be-built home and the years they have spent carving out and establishing their pecan farm.

---

[146] A Natural Areas Inventory of Douglas County, Kansas, K. Kindscher, *available at* https://kindscher.ku.edu/research/conservation/a-natural-areas-inventory-of-douglas-county-kansas.

e. Plaintiffs Scott Thellman, Sr., M.D., and Nancy Thellman purchased their home and surrounding 114 acres that overlook the Valley roughly 25 years ago. Their property is abutted by lush farmland on one side and protected natural lands owned by the KU Endowment Association on the other. They purchased their home in reliance of the Comprehensive Plan's (as amended and restated) representations that the Valley would remain significantly agricultural and not subject to large-scale development. Comforted by the County's commitment to maintain the Valley, the Thellmans have invested heavily in the 1800s home and barn, outbuildings, and land. Their property is also a registered Kansas Agritourism site. With considerable expense, they have restored their historic barn to host chef dinners, special events, and pizza nights that regularly sell out weeks or months in advance. With visitors from Lawrence, Kansas City, Topeka, and surrounding areas to enjoy food made with products grown on-site, the Thellmans have created the epitome of small-scale agrotourism, and their investment had paid off. The value of their property has significantly increased because of its unique, rural location with breathtaking views of the City of Lawrence and the fertile Valley. Their home is now within a half mile of the Project, and their predominant view would become the 1,100-acre power plant. This will immediately and irreversibly lower the value of their property. The future of their agrotourism is also thrown into jeopardy. The Project's industrial power plant will result in considerable loss of business income and squelch plans for future growth and expansion. To reach their farm, patrons would be forced to drive past acres and acres of solar panels, only to be greeted by a panoramic view of the entire project once arrived at their home; far from the bucolic setting they

have invested in. The Thellmans' farm also serves as the base of operations for Plaintiff Juniper Hill Farms, LLC, who, as a tenant, leases land and buildings to grow, process, store, pack, and ship conventional and organic produce, row crops, and hay. As described herein, the Project will negatively impact Plaintiff Juniper Hill Farms, LLC. The Thellmans invested in the Valley based on the County's binding documents. After completely ignoring those documents, the County has negatively impacted the Thellmans.

f.   Plaintiffs Paulette Schwerdt and Stacey Wendland are particularly concerned with the uninvestigated potential for damage caused by the installation of this power plant on top of an alluvial aquifer. No project of this type has ever been placed on such a unique environmental asset. Neither Savion/Evergy nor the County have investigated what building the power plant on top of this ground would entail. Nor have they investigated what problems will be encountered by driving over 141,000 galvanized piers into this sandy, always wet (and fairly regularly flooded), extremely corrosive soil.

g.   Plaintiffs Juniper Hill Farms, LLC, and Scott Thellman, Jr. ("Thellman"), are similarly situated to Pines. Wildlife contamination and overgrazing, stormwater drainage, water quality, and reliance upon the Comprehensive Plan also apply with equal force to this locally and first generation owned and operated organic and conventional farming operation. In the Valley, Plaintiff Thellman owns Juniper Hill Farms, LLC, and Pine's Garden & Market and is a co-owner of Sunflower Provisions. These businesses coexist to form a diversified agricultural operation producing organic and conventional vegetables, traditional row crops, small grains

and hay, a horticultural operation producing annual and perennial plants, and a grocery distribution business and processing kitchen to further process, add value to, and distribute locally grown produce and proteins. These businesses—important fixtures in the Valley, to Grant Township, and Douglas County—face several impacts by the Project; impacts completely ignored by the County.

h.   Plaintiff Bonnye Little-Hadl ("Little-Hadl") lives less than 1,000 feet from, and has property contained within, the Project. She is concerned about the increased noise caused by a new and larger substation. This noise will occur 24 hours a day, 7 days a week, ruining both her property and the idyllic setting she purchased. Moreover, like all Plaintiffs, she will be forced to endure increased traffic on dangerous roads due to increased construction. Her home will lose value as a result of the County's purported approval of the Application. Once the power plant is installed feet away from her property, the damage will be irreversible. Moreover, the Application shows a battery storage facility near her home. Although Savion/Evergy claims the battery storage has been removed from the Application, it remains in the documentation:[147]

---

[147] Conditional Use Permit Plans, Attachment D at pp. 8, 32 (updated 12/24/2023).



Whether the battery storage occurs within this Application or not, Savion/Evergy intends to expand. Just like the County, Savion/Evergy appear to have sought approval in piecemeal fashion without admitting their full long-term intentions. Once the Valley is forever scarred with a power plant, how much easier will it be to later obtain Conditional Use Permits for subsets of planning? Or expansion of the power plant? Or purchase of cheap land because landowners are leaving in droves? Plaintiff Little-Hadl is also aggrieved by the County's failure to ensure adequate fire protection services, leaving her home at greater risk for fire and contamination.

i.   Plaintiffs Lisa Harris ("Harris") and Rick Frydman ("Frydman") are also aggrieved by the County's failure to follow the Comprehensive Plan. Citizens of the City of Lawrence, they have spent significant time reading and relying upon the Comprehensive Plan and its references to preserving Douglas County's agrarian heritage, high quality agricultural lands, and local food production. Plaintiff Harris

was a member of the Steering Committee for the Comprehensive Plan and served on the Planning Commission. The County's refusal to follow the Comprehensive Plan is acutely felt by those who invested so much—and compromised so often—to reach consensus. These Plaintiffs also firmly believe that the County's flippant attitude to binding documents like the Code and the Comprehensive Plan will cause fewer community members to step forward and volunteer their time and talents to the County. This, in turn, will result in more self-serving and uneducated planning decisions, like the County's approval of the Application.

j.  Plaintiffs Lowell Neitzel and Krystale Neitzel purchased their home, nestled into fields of agricultural land, in 2006 with the goal of slowly acquiring surrounding property to increase their farming operation. Their home sits on 3 acres, but will be completely surrounded on all four sides by the power plant:[148]



---

[148] CUP Document 8, Existing Conditions Site Plan at p. 6.

This will ensure that the property surrounding their home will be unavailable for farming in their lifetime, the power plant ruining the soil. Moreover, the Neitzels—already facing stormwater issues in their home—recently invested nearly $75,000 into remediation efforts, including the installation of French drains, piers, and vapor barriers. Today, a mere 2- or 3-inch rainfall completely fills their drainage ditches with water. The power plant, completely surrounding them, will worsen this issue and likely repeatedly flood their basement with even minimal rainfall amounts.

271.    Although recognizing the negative visual impact, the County's Findings of Fact note "the applicant proposes to mitigate this impact through screening." This screening is nearly nonexistent:[149]



272.    As identified by the green highlighting, minimal areas will receive landscape screening; further, this screening does nothing for the landowners at higher elevations who look

---

[149] Application Landscaping Plan at p.12 (6/16/23).

out over the Valley. For the Neitzels—surrounded by the power plant—the screening does not even hide their home from the Project.

273.    Finally, the County's Findings of Fact claim the "proposed use is not expected to have a negative impact on the natural environment but rather would contribute to reducing greenhouse gases and improve the natural environment." This claim cannot be supported by the record.

274.    The County was presented with extensive materials describing the negative impacts on the natural environment caused by the Application. Further evidencing the County's bias, this evidence was ignored, and the County—and specifically Commissioner Willey—engaged in its own efforts to drum up materials it could rely upon to justify approving the Application.

275.    Even the Planning Commission ignored the reality of the damage posed by stormwater runoff:

    a.   Planning Commissioner Rexroad admitted that the Planning Commission only had "light discussion" of the stormwater impacts caused by the roughly 8,000,000 square feet of solar panels proposed.[150]

    b.   Planning Commissioner Rexroad also confessed that the Planning Commission failed to discuss the City of Lawrence's interest in the Application, including the infrastructure the City owns and maintains: "That was not part of the conversation."[151]

---

[150] Planning Commission chair says more work is needed on flooding concerns related to solar project; he urges North Lawrence to have a voice, April 9, 2024, *available at* https://www2.ljworld.com/news/county-government/2024/apr/09/planning-commission-chair-says-more-work-is-needed-on-flooding-concerns-related-to-solar-project-he-urges-north-lawrence-to-have-a-voice/.
[151] *Id.*

c.   The Planning Commission was given ample evidence that stormwater runoff is a major concern in the Application. For example, County Engineer Chad Voigt advised the Planning Commission that stormwater review for the Application is a "serious issue," in part because if the aged North Lawrence pump "is overloaded, then we are flooding everybody."[152]

276.   The harm caused is no secret; the Applicant acknowledged the harm caused by using a CUP.[153]

277.   "A conditional use permit provides a **public hearing process** for the establishment of land uses which may be [or may not be] desired in the community but which, **by the nature or scale of the use**, have the potential to **negatively impact surrounding land uses**, the **character of the area**, the **road network**, or **other features in the area**."[154]

278.   "The conditional use permit process is **intended to insure**[155] that the **proposed uses are appropriate** in the unincorporated portion of Douglas County; **especially** those land uses that are of a sensitive nature due to the **intensity of the use or environmental impacts** associated with the normal operation of the business or activity."[156]

279.   "There is no implied 'right' for any person or landowner to obtain a conditional use permit for any use on any property."[157]

---

[152] *Id.*
[153] Savion/Evergy also had to try to force the Project into a CUP because the County generally and Commissioner Kelly specifically is on record as stating they would not rezone this important farmland.
[154] County Code, § 12-307-2.a (emphasis added).
[155] Tellingly, the Code uses "insure" and not "ensure."
[156] County Code, § 12-307-2.b (emphasis added).
[157] County Code, § 12-307-2.c.

280.    For example, the Applicant's Vegetation & Agrivoltaics Management Plan acknowledges "the dominance of hydric soil in the Project, and potential soil compactions during solar construction could decrease water infiltration resulting in wetter soils."[158]

281.    Other sources, given to—but ignored by—the County, show the stormwater issues associated with this Project will stress the already fragile balance of stormwater absorption in the Valley.

      a.    "The large amount of impervious surface inherent in the construction of a large-scale solar arrays is unlike most other construction activities...and entails challenges not encountered in traditional development projects. If not properly managed through appropriate design and mitigation measures, stormwater discharged during and after the construction of solar arrays can be a significant source of pollution resulting from increased runoff, erosion, and sedimentation, which can adversely impact wetlands or other natural resources...This includes ensuring that effective controls are put in place to manage the total runoff volume and velocity that can lead to the loss of topsoil, erosion and sediment discharges from disturbed areas and stormwater outlets, and erosion along downstream channels and streambanks. The ability to address such significant environmental problems during construction and post-construction becomes more difficult as site imperviousness increases."[159]

---

[158] Application Vegetation & Agrivoltaics Management Plan at p.12 (8/17/23).
[159] Connecticut Department of Energy & Environmental Protection, Guidance Regarding Solar Arrays and the General Permit for the Discharge of Stormwater and Dewatering Wastewaters from Construction Activities (Jan 6, 2020).

282.    "Design decisions, including siting drainage ditches, containment ponds and access ways, should be made with the landowner and in a manner that protects future agricultural practices."[160]

283.    "In general, a 100-foot buffer is required between the footprint of the facility and adjacent wetlands and watercourses."[161]

284.    Finally, the County's Findings of Fact claims—without any evidence to back up its statement—that the Application would "contribute to reducing greenhouse gases to improve the natural environment."[162] The County has not conducted any studies or analyses to back up this claim. It has not investigated the greenhouse gases generated to, among other things:

   a.   prepare the land for installation of the power plant, including the required detention (read: retention) ponds for stormwater runoff;

   b.   produce, transport, and install the solar panels and piers;

   c.   monitor and service the power plant post-installation;

   d.   mow the vegetation or spray herbicides to kill the vegetation; or

   e.   decommission and reclaim the Project Area.

285.    Because nearby properties will be forever detrimentally affected by the Application, this factor weighs strongly in favor of denial of the Application, rendering the County's decision to the contrary unreasonable.

286.    The County's refusal to acknowledge this simple reality evidences its bias, further rendering its decision to approve the Application unreasonable.

---

[160] Connecticut Department of Energy and Environmental Protection & Connecticut Department of Agriculture, Draft Guidance for Sitting Solar on Agricultural Land, August 2023.
[161] Id.
[162] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

*The subject properties' lack of vacancy in agricultural production*

287.    The County's Findings of Fact claims this factor is irrelevant because, "the subject property has been historically utilized for its zoned use, agricultural."[163]

288.    The County's determination that this factor is irrelevant is erroneous.

289.    As the County's Findings of Fact admits, the subject properties have been historically utilized for their zoned use—agriculture.

290.    This fact is **uniquely** relevant, because the length of time the subject properties have remained vacant is **zero**, whether measured in years, months, weeks, days, hours, minutes, or seconds.

291.    Because the subject properties have been fully utilized for agricultural purposes, this factor weighs strongly in favor of denial of the Application, rendering the County's decision to the contrary unreasonable.

292.    Indeed, the County's finding that this factor simply does not apply *because it weighs against the County's decision* is itself evidence of the County's unreasonable decision making on the Application.

*The destruction of the Plaintiffs' property values are not offset by any purported de minimis public health, safety, or welfare benefit*

293.    The County's Findings of Fact claims this factor weighs in favor of approval of the Application because:

> "Many public comments were received regarding the benefits of renewable energy. Commissioners agree this is a very important and valuable consideration. The hardship created by taking this prime farmland out of traditional row crop farming is minimized by the 25-year length of the conditional use permit. The applicant will

---

[163] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

have to reapply in 25 years. The commission believes that these factors may be reevaluated at that time by the then elected governing body."[164]

294.    These allegations are false.

295.    First, the statement fails to acknowledge that many of the public comments supporting renewable energy were by Plaintiffs themselves, who support renewable energy, but not at the destruction of the most valuable and fruitful soil in Douglas County. Plaintiffs' supporting renewable energy does not indicate a support for destroying the Valley's irreplaceable agricultural land. In fact, doing so actually destroys *more* land. The County has allowed for the permanent destruction of the Project area. And without adequate stormwater mitigation, the remaining landowners in the Valley will be annually and repeatedly inundated with stormwater and herbicide runoff that will destroy their crops. At a minimum, this will occur for 25 years. These farmers—many multigenerational—cannot simply trade their tillers, seeders, and combines for a pencil and change careers. Instead, they'll be forced to move. Finding new ground that assuredly will not offer the yields they can obtain in the Valley. So, they will have to increase the number of acres they farm in order to meet their same production quotas. As a result, the County's action will cause *more* land use for agriculture, not less.

296.    Second, the statement also omits the plethora of negative comments the County received regarding this Project. However, the County's refusal to acknowledge this reality serves to highlight the bias displayed by the County. Further highlighting bias is the statement's limit of the impact of its decision on "traditional row crop farming." As described elsewhere, the County's general—and Commissioner Willey's specific—hostility toward the very farming and agricultural

---

[164] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

operations the County's policies and procedures repeatedly tout as deserving of protection is a bias that permeates the County's approval of the Application, rendering it void.

297.   Third, despite acknowledging the hardship caused by eliminating farming in the Valley (through land use, stormwater runoff, and herbicides), the County falsely claims this is "minimized by the 25-year length of the CUP." First, this is either a naïve analysis or one intended to deceive. The power plant will not be decommissioned in 25 years. At the expense of installation and decommission, one cannot claim as much with a straight face. Second, the damage will already, irreversibly, be done to the Class 1 and Class 2 soils in the Valley. The leach from herbicides. The stormwater issues. The leach from the plethora of piers. They will all combine to forever destroy this unique land in Douglas County. This is well documented. For example, in Washington, an energy company claimed that "1,000 acres of prime farmland could revert to agriculture in 25 years and be as productive as before."[165] The State of Washington determined this is false because solar power plants "compact and shade ground, depriving it of sunlight and organic material...[which may require] decades to recover after the solar panels and posts are gone...Even with decommissioning, WSDA does not expect the ground to meet pre-project agricultural viability."[166] "The project impact is not short term or transitory in nature because not all damage will be remediated at the point of decommissioning."[167]

298.   Just like in *Combined Inv. Co v. Bd. of Cnty. Comm'rs of Bulter Cnty.*, 227 Kan. 17, 605 P.2d 533 (1980), "[t]here is no evidence that public health, safety, and welfare will be promoted by [approval] of the application. On the other hand, there was an abundance of evidence

---

[165] Capital Press, Washington state: Solar panels will damage farm soils (Jan. 25, 2024), *available at* https://www.capitalpress.com/ag_sectors/rurallife/washington-state-solar-panels-will-damage-farm-soils/article_09f272ea-baf1-11ee-a225-eb49c72e324a.html.

[166] *Id.*

[167] *Id.*

as to the cost of [approving the application]. This would also affect neighboring [North Lawrence], and state highway[s]. These matters affect the public welfare." *Id.* at 31. The County ignored all of this.

*Commissioner Willey's directives, involvement, and leading of the Project's Application has compromised the recommendations of permanent or professional staff*

299.    The County's Findings of Fact claims this factor weighs in favor of approval of the Application because: "Staff recommended approval of the CUP."[168]

300.    The mere recommendation of the Application by Mary Miller is immaterial— especially when Ms. Miller was a member of Commissioner Willey's "crew."

301.    In fact, by placing the individual responsible for making the County staff's recommendation on her "crew," Commissioner Willey tainted the staff recommendation with prejudged bias and *ex parte* meetings, including the December 5, 2023, meeting.

302.    This is evidenced by the fact that the staff report contains glaring falsehoods that appear designed to reach the result Commissioner Willey orchestrated, including, but not limited to:

    a.    Claiming the Project will result in the nearby coal power plant being closed. Evergy has, on the record, denied that this Project will result in the closing of the coal plant.

    b.    Claiming the Lawrence Municipal Airport's Aviation Advisory Board approved the Project without any concerns. This too is false. The Aviation Advisory Board was *never* consulted or asked to opine on the Project. Instead, one of its members discovered the plans and believed that glare was a concern that required investigation. but the County failed to investigate this.

---

[168] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21.

c.  Claiming the Project contains agrivoltaics and that the agrivoltaics present justifies

approving the Application.

303.    As a result, this factor—and the obvious indicia of bias—should weigh against the

reasonableness of the County's decision.

*An industrial power plant in the Valley violates the Comprehensive Plan*

304.    The County's Findings of Fact claims this factor weighs in favor of approval of the

Application because:

> "The commissioners acknowledged and considered the comprehensive plan. Plan
> 2040 is a flexible document. Plan 2040 is representative of and includes conflicting
> values highlighted by this particular application. For example, the goal of
> preserving farmland and the goal of preserving the planet for the next generation.
> These values were discussed by elected officials when the solar regulations were
> considered and adopted. The adopted solar regulations specifically allow the
> placement of a commercia/utility solar conversion system on prime farmland. The
> inclusion of agrivoltaics captures the value of agriculture and allows this particular
> land, under and around the solar panels, to remain agricultural. The limited 25-year
> lease allows the land to be returned to traditional agricultural use. As indicated in
> the staff report, Goal 3 of Chapter 2, Natural Resources of Plan 2040 states,
> "Manage air quality in the community to limit outdoor air pollution, excessive
> greenhouse gases, and indoor air pollution."[169]

305.    These allegations are false.

306.    First, although the Commission may have acknowledged the Comprehensive Plan,

they failed to consider or follow it. As addressed elsewhere, the Comprehensive Plan cannot be

reconciled with the County's decision. They are diametrically opposed, and the placement of the

industrial power plant in the Valley directly violates the Comprehensive Plan.

307.    Second, the Comprehensive Plan is only a "flexible document," to the extent it is

properly amended. The Comprehensive Plan was never amended to allow a power plant in the

---

[169] Agenda Item Report, re: Resolution No. 24-14; and Findings of Fact at p. 21-22.

Valley. As a result, the County has violated the "binding" Comprehensive Plan that "all development proposal[s] must comply with."

308.    Third, the Comprehensive Plan does not contain "conflicting values." As described above, the Comprehensive Plan repeatedly notes a focus on "maintain[ing] and protect[ing] working lands and high-quality agricultural soils for future generations."[170] The Comprehensive Plan does not discuss "preserving the planet for the next generation." In fact, the Comprehensive Plan is completely void of any reference to the "planet," or "Earth."

309.    Fourth, "discussing values" "when the Solar Regulations were considered and adopted" does not fulfill the County's obligations when considering the Application. And where the Application – and, if the County now wants to claim, the Solar Regulations themselves – conflict with the Comprehensive Plan, the County is required to amend the Comprehensive Plan, and provide Plaintiffs with all due process rights in such amendment, before violating the "binding" Comprehensive Plan.

310.    Fifth, the Solar Regulations cannot nullify or void the Comprehensive Plan. The County's Findings of Fact's claim that the Solar Regulations allow a power plant on "prime farmland" only underscores the unreasonableness of the County's decision. "Prime farmland" does not exist within the Comprehensive Plan. In the County Code, "Prime Farmland"—used as a term of art—incorporates the definition by the Natural Resource Conservation Service, and generally means Class 1 and Class 2 soils.[171] Within the Solar Regulations, "prime farmland"—not used as a term of art—is undefined. But "prime farmland," used within the Solar Regulations, cannot mean Class 1 and Class 2 soils, because the Solar Regulations separately require a soil map showing

---

[170] Comprehensive Plan at p. 20.
[171] County Code, § 20-810(k)(1) (definition of Environmentally Sensitive Lands); § 12-314-2.02 (definition of Environmentally Sensitive Lands).

Class 1 and Class 2 soils *and* showing prime farmland.[172] Thus, the Solar Regulations do not permit a power plant to be located on Class 1 and Class 2 soils. This analytically makes sense, because Douglas County has plenty of land that is not classified as Class 1 or Class 2 soil.

311.    Sixth, the County's claim that agrivoltaics are included in the Project simply does not reflect reality. First, nothing in the Application requires any land within the Project to be used for agrivoltaics. And, indeed, no land is identified in *any* document as reserved for agrivoltaics usage. Instead, the Vegetation & Agrivoltaics Management Plan merely states that "[a]reas within the Project fence will be selected for agrivoltaics **research**."[173] And that "research" would be limited to five categories: "ecosystem services," "grazing," "specialty crops," "perennial agriculture," and "apiary."[174]

      a.  Ecosystem services. This "research category" is merely planting "native grasses, sedges, rushes, and wildflowers to re-establish the native prairie ecosystem in the area." This is not an agricultural use, nor is it agrivoltaics.

      b.  Grazing. This "research category" is merely aspirational hopes at some undefined point in the future, noting grazing "*would* include livestock *such as sheep* to perform routine maintenance on vegetation without the use of mowing or other equipment," and noting the need for a "grazing agreement…once the area and shepherd has [sic] been identified."[175] No plan. No requirement. Not even an area designated. However, the "cutting/mowing" pro forma robustly describes mowing

---

[172] County Code, § 12-306-49.06.b.10 (requiring an Applicant to provide a "soil map showing location of soils classified as Class 1 and 2 soils, prime farmland, and farmland of statewide importance").

[173] Application Vegetation & Agrivoltaics Management Plan at p. 17 (8/17/23) (emphasis added).

[174] Application Vegetation & Agrivoltaics Management Plan at p. 17-18 (8/17/23).

[175] Application Vegetation & Agrivoltaics Management Plan at p. 18 (8/17/23).

windows and changes in mowing plans, turning on rainfall and interference with the solar panels at 18 inches in height.[176]

c.   Specialty crops. This "research category" notes "planting of specialty crops such as sunflowers, lavender, or vegetable crops" to "assist in nutrient retention and water infiltration into the soil." However, no sunflowers, lavender, or vegetable crops are identified in the seed mixes.[177]

d.   Perennial agriculture. This "research category's" description merely states what is defined as "perennial agriculture."[178] The Application does not even represent that perennial agriculture *may* be included at some undefined future (like grazing).

e.   Apiary. The Application merely states that "specific beehives or boxes will be established onsite and maintained."[179] The Application does *not* represent that apiaries will be operated by local honey farmers, or even that honey will be gathered from these hives. Moreover, "pollinator habitats are not in and of themselves considered dual use" for purposes of agrivoltaics.[180]

312.   The Application even contains a "Vegetation Management Decision Tree" to give the appearance of the inclusion of agrivoltaics:[181]

---

[176] Application Vegetation & Agrivoltaics Management Plan at p. 19 (8/17/23).
[177] Application Vegetation & Agrivoltaics Management Plan at Appendix B, pp. 23-30 (8/17/23).
[178] Application Vegetation & Agrivoltaics Management Plan at p. 18 (8/17/23).
[179] Application Vegetation & Agrivoltaics Management Plan at p. 18 (8/17/23).
[180] Connecticut Draft Guidance for Sitting Solar on Agricultural Land, August 2023.
[181] Application Vegetation & Agrivoltaics Management Plan at p. 22 (8/17/23).

## Kansas Sky Energy Center Vegetation Management Decision Tree



313.     Even this decision tree has problems. The only place subject to agrivoltaics is "inside the fence." The only place subject to grazing is where there is a "forage seed mix per Grazing Management Plan." But there is no Forage Seed Mix; it does not exist. It is not contained in the Vegetation & Agrivoltaics Management Plan, nor does it exist in the Grazing Management Plan. The decision tree reinforces that, to the extent any agrivoltaics occurs at all, it is limited to mere "research."

314.     Moreover, given the need to use chemicals to kill the weeds that will undoubtedly rapidly grow in the most fertile soil in Douglas County means not only that no agrivoltaics will occur, but that these "research subjects" will quickly be abandoned, prioritizing panels free and clear of shade over agrivoltaics "aspirations" or "research." The County's reliance on an idea that lacks substance evidences the County's bias and the unreasonableness of the Application, rendering the approval void.

315.     The viability of agrivoltaics within the power plant is completely rebutted by the Manufacturer Specifications submitted with the Application. In it, it contains promotional

photographs of an industrial solar power plant. Its barren, herbicide-drenched landscape proves that agrivoltaics will not occur in the Project:[182]



316.    In short, the Application's agrivoltaics, singled out by the County as justification for its approval, is nothing more than enough lip services to the Four Points to garner Commissioner approval of the Project. Agrivoltaics is not part of the Project. There are no commitments with agrivoltaics within the Project. It is an illusion. The fact that it is mentioned at all is due to Commissioner Willey's advocacy on behalf of Savion/Evergy. And the County's reliance on agrivoltaics as justification for its approval of the Application evidences the patent unreasonableness of the County's decision. Nothing in the Application "allows this particular land to remain agricultural."

317.    Seventh, the County's claim that, because the Application's lease is "limited" to 25 years, the land can return to traditional agricultural use is belied by reality. Although a Decommissioning/Reclamation Plan, now in its fifth revision, was submitted with the Application, the County has modified the conditions in its approval. A sixth revision, updated to account for the change in costs and processes, has not been submitted. Moreover, as described herein, the damage caused by the Project occurs as soon as construction is started. Thus, the damage is caused

---

[182] Application Exhibit B, Manufacturer's Specification at p. 4.

long before the 25-year lease expires, and the damage cannot be ameliorated by the decommissioning plan. Moreover, the Project appears *designed* for expansion of the power plant in multiple directions, including the addition of lithium battery storage. The claim that the Project—after full integration into the area electrical grid and sitting in the middle of a built-out solar complex—defies logic.

318.    Eighth, the citation to the Comprehensive Plan's desire to "manage air quality in the community to limit outdoor air pollution, excessive greenhouse gases, and indoor air pollution" is *worsened*, not improved, by the incalculable number of gasoline and Diesel trucks, excavators, bulldozers, lawn mowers, pile drivers, delivery trucks, employee vehicles, service vehicles, and manufacturing emissions required to install the power plant. Moreover, the Comprehensive Plan provides concrete methods to achieve this aim, including:

    a.  "Develop policies to reduce vehicle emissions by reducing the amount of vehicle miles traveled";[183] This action item is worsened, not improved, by the Application.

    b.  "Develop land use regulations and incentives to reduce greenhouse gas emissions";[184] This action item is unaddressed by the Application.

    c.  "Reduce toxic emissions in the community and comply with regional, state, and federal clean air regulations";[185] This action item is worsened, not improved, by the Application.

    d.  "Address sources of indoor air pollutants to improve community health";[186] This action item is unaddressed by the Application.

---

[183]    Comprehensive Plan at p. 14, §3.1.
[184]    Comprehensive Plan at p. 14, §3.2.
[185]    Comprehensive Plan at p. 14, §3.3.
[186]    Comprehensive Plan at p. 14, §3.4.

     e.  "Continue conducting the Lawrence-Douglas County Sustainability Office community-wide greenhouse gas inventory every 5 years";[187] This action item is unaddressed by the Application.

     f.  "Prioritize efforts to reduce greenhouse gas emissions in municipal operations."[188] This action item is likely worsened, not improved, by the Application.

<i>Bias of the Planning Commissioners and Commissioners</i>

319.    Also relevant under *Golden* to the reasonableness of the County's decision on the Application is bias of Planning Commissioners and County Commissioners.

320.    "[T]he neutrality and impartiality of members of a zoning proceeding are essential to the fair and proper operation of a zoning body, and the evil to be avoided is the creation of a situation tending to weaken public confidence in the zoning process. In a zoning proceeding, bias can take the form of favoritism toward one party or hostility toward the opposing party, that is, personal bias or prejudice that imperils the open-mindedness and sense of fairness that a zoning official is required to possess." 4 A.L.R. 6th 263 (2005).

321.    The Planning Commission's Chairman, Commissioner Gary Rexroad, displayed a bias in favor of the Application.

     a.  Plaintiff Pines' Farm Manager, Jeff Dennis, spoke in opposition to the Application[189] during the Planning Commission's December 18, 2023, meeting. Mr. Dennis did a "great job," offering both "[a]rticulate and well delivered thoughts."[190]

---

[187] Comprehensive Plan at p. 14, §3.5.
[188] Comprehensive Plan at p. 14, §3.6.
[189] Albeit an Application materially different than the one the County Commission considered after Commissioner Willey's advocacy and manipulation of the Project.
[190] Planning Commissioner Rexroad to Jeff Dennis, December 20, 2023 at 1:38 p.m.

b. After the meeting, on December 20, 2023, Planning Commissioner Rexroad wrote to Mr. Dennis:[191]

| | |
|---|---|
| **From:** | Gary Rexroad <grexroad@live.com> |
| **Sent:** | Wednesday, December 20, 2023 1:38 PM |
| **To:** | Jeff Dennis |
| **Subject:** | RE: solar comment Pines Int. |

Hi Jeff, a couple things..

You did a great job at the planning commission Monday night. Articulate and well delivered thoughts. We need more of that at City Hall and I hope you will keep coming and contributing.

Second... We don't know what the County Commission will decide to do on the Solar Farm request but thinking about your comments and concerns in the event they do allow it, presents an opportunity for you.

Here is an idea... There are hundreds of acres around the project area that are available for traditional row cropping along with hundreds planned under glass that might grow things... I wonder if you would like to work with the leader of that project to see if they would be interested in Pines farming that ground and working with them on developing Agrivoltaics techniques?

I'm not trying to convince you to change your opinion on this project but if the CC does decide to do it, Pines could be first in line to farm on this soil without having the expense of owning or paying taxes on it.

If you are interested in talking more, I'd be happy to visit with you and also to help you with an introduction to the developers...

Gary

c. Mr. Dennis—and Pines—understood Planning Commissioner Rexroad's quid pro quo: if Pines did not speak out against the Project to the County Commission, Savion/Evergy would give Pines cheap land to farm.

d. Planning Commissioner Rexroad was one of only four planning commissioners who voted in favor of Savion/Evergy's Application.

322.    Since the Application has become public knowledge, there has been an open hostility toward the citizens and farmers of small, agrarian Grant Township. Incredibly, and not just unsupported by the record but directly contradicted by it, the County declared that the land subject to the Project "had no life in it," suggesting that the soil was killed by conventional farming.

---

[191] Planning Commissioner Rexroad to Jeff Dennis, December 20, 2023 at 1:38 p.m.

This type of open hostility toward the Valley's citizens and their small-scale farms can only be explained by a prejudged bias.

323.    It is now no secret that Commissioner Willey has a fascination with "agrivoltaics." But this pet project—undefined, unsanctioned, unvetted, and nonexistent in the County's planning policies or Comprehensive Plan—is little more than a buzzword, and the County, with Commissioner Willey at its head, has substituted the County's longstanding, and binding, planning policies with phantom "agrivoltaics."

324.    Further evidencing her bias for the Application and hostility against the citizens of Douglas County, Commissioner Willey is a founder of FarmTender, LLC, which promotes "regenerative farming."[192] Commissioner Willey describes the practice as attempting to "restore the soil biome to a condition similar to that existing prior to the arrival of agriculture."[193]

325.    Curiously, FarmTender, LLC, has failed to take a position on the installation of over 141,000 steel piers rammed into the Valley's fertile land.

326.    This is yet more documented, published hostility toward the farmers in the Valley.

327.    Despite voting for the Project, when faced with development near Willey's home, she was opposed to amending the Comprehensive Plan.[194] Tellingly, that project followed the proper channel of first amending the Comprehensive Plan before attempting to ram through a CUP.

328.    And one of Commissioner Willey's Four Points, hiring an agrivoltaics manager, was designed to directly benefit Commissioner Willey *personally*. Commissioner Willey first contacted TNC to solicit them to be the "manager" on Savion/Evergy's Application on December

[192] https://www.farmtender.us/about-us/.
[193]        https://www.farmtender.us/about-us/.
[194] Douglas County Commission denies request from developers of project south of Lawrence, February 7, 2024, *available at* https://lawrencekstimes.com/2024/02/07/dgcocomm-denies-plan-amendment-crossings/.

12, 2023. At the time, and through March 6, 2024, **Commissioner Willey's husband worked for TNC**. This undisclosed conflict of interest evidences a degree of bias and manufactured kickback that renders the County's decision unreasonable, and therefore void.

329.    Meanwhile, Commissioner Reid tipped her hand and showed the County's bias in approving the Application. The Neitzels reached out to Commissioner Reid and requested a meeting to discuss the Project. The meeting, occurring on April 4, 2024, confirmed to the Neitzels that Commissioner Reid had already decided to vote to approve the Application. Although Commissioner Reid offered platitudes of impartiality and noncommittals—saying "my mind is not made up," and she was "weighing the pros and cons"—her parting comment exposed reality. Commissioner Reid told the Neitzels: "Either way, we will get sued." The Neitzels understood Commissioner Reid; if the Application were approved, the County may face litigation by its citizens, but if the Application were denied, the County would face Savion/Evergy's deep litigation pockets. The Neitzels understood who the County would choose to fight. Just like Commissioner Willey, the die was already cast with Commissioner Reid.

330.    Plaintiff Peters attempted to meet with Commissioner Reid, but she refused to respond to his requests.

331.    Commissioner Kelly similarly exposed the County's bias in approving the Application. On March 29, 2024, Plaintiff Nancy Thellman met with Commissioner Kelly to discuss her objections to the Project. During the meeting, Commissioner Kelly told Plaintiff Thellman, "Either way we vote, we're going to get sued." Just like Commissioner Willey and Commissioner Reid, Commissioner Kelly had already decided to approve the Application.

332.    Commissioner Kelly's predetermination was reaffirmed on April 2, 2024, when Plaintiff Josh Peters also met with him. During the meeting, Commissioner Kelly appeared to

already have his mind made up. Instead of listening to Plaintiff Peters' concerns, Commissioner Kelly sparred with him, advocating approval of the Project. During the meeting, Commissioner Kelly referenced the County being sued for not approving a project. Commissioner Kelly did agree that the Project will damage Veranda Venue. When Plaintiff Peters noted the uncertainty of the total financial damage, **Commissioner Kelly asked "how would it make you feel if we lowered your taxes?"** Plaintiff Peters was stunned by the apparent bribe, and extracted himself from the topic by saying he would need to discuss it with his wife. Plaintiff Peters never followed up on Commissioner Kelly's offer to obtain preferential tax treatment due to the County's inevitable approval of the Application.

333.   The failure of the County to consider this factor renders its approval of the Application unreasonable and void.

*The availability of adjacent land*

334.   Also relevant under *Golden* to the reasonableness of the County's decision on the Application is the availability of adjacent land to complete the Project without the harm that *this* Project area will cause.

335.   "The availability of adjacent land capable of removing the need for a variance does not necessarily require that relief be denied. However, an applicant for a variance will not suffer unnecessary hardship if a variance for a commercial establishment is denied where the applicant owns other real estate in the area capable of being so developed." 83 Am. Jur. 2d Zoning and Planning § 731.

336.   In its March 21, 2024, "Supplemental Materials" to its Application, Savion/Evergy claims it "evaluated all potential sites in Douglas County, and determined that the Project location, as proposed, is the only feasible site in the County."[195]

337.   However, Evergy already owns ample adjacent land. For example, Evergy owns the following:



338.   And that land **already has a coal power plant operating on it**.

339.   No rezoning is required. No Class 1 and Class 2 soils, currently serving their highest and best use as private farming, would be destroyed.

340.   The failure of the County to consider this factor renders the approval of the Application void.

<u>The County Failed to Consider Mandated Criteria, Violating the County Code</u>

341.   Also relevant under *Golden* to the reasonableness of the County's decision on the Application is whether the County considered and complied with all criteria mandated to be considered within the County Code.

---

[195] Application Supplemental Materials at p. 7 (3/21/24).

342.   The Commissioners are required to consider express factors within the County Code,[196] and the failure to consider these factors renders the decision on the Application void.[197]

343.   The Commissioners failed to consider these factors.

344.   If the Commissioners *had* considered these factors, they could not have reasonably reached the decision to approve the Application.

345.   These factors include:

a.   Visual Impact;[198]

b.   Noise Impact;[199]

c.   Impact on Wildlife Habitat/Native Flora and Fauna/[200] 'Heritage Habitat Areas' [A Natural Areas Inventory of Douglas County in Northeast Kansas Prepared by the Kansas Natural Heritage Inventory, Kansas Biological Survey];[201]

d.   Impact on critical wildlife habitats, current state-listed threatened and endangered species, and species in need of conservation as defined by the Kansas Department of Wildlife and Parks;[202]

e.   Bird migration/strike;[203]

f.   Endangered or Threatened Species;[204]

g.   Impact on water quality and soil erosion;[205]

[196] County Code, § 12-306-49.04.b; § 12-307-2.08.
[197] County Code, § 12-307-2.08 (Commissioners "shall consider at least the following factors").
[198] County Code, § 12-306-44.03.b.1; § 12-306-49-.04.b.1.
[199] County Code, § 12-306-44.03.b.2.
[200] County Code, § 12-306-49-.04.b.2
[201] County Code, § 12-306-44.03.b.3.
[202] County Code, § 12-306-49-.04.b.4.
[203] County Code, § 12-306-44.03.b.4.
[204] County Code, § 12-306-44.03.b.5.
[205] County Code, § 12-306-44.03.b.6; § 12-306-49-.04.b.6.

h.  Impact on environmentally sensitive lands;[206]

i.  Degree to which agricultural uses and wildlife habitat are accommodated with the facility layout and design;[207]

j.  Impact on infrastructure, including roads and bridges for construction access;[208]

k.  Aviation/Federal Aviation Administration (FAA) impacts;[209]

l.  Reception Interference;[210]

m. Impact on cultural, historical, or archeological features/heritage;[211]

n.  Maintenance of the Rural Character;[212]

o.  Cumulative Impact;[213]

p.  Company experience, reputation, and financial ability;[214]

q.  Emergency services and training requirements;[215]

r.  Decommissioning, removal, reclamation, and disposal;[216]

s.  Bond agreement, or other means of ensuring reclamation, disposal, and decommissioning performance;[217]

t.  Specific requirements for building and construction;[218]

---

[206] County Code, § 12-306-49-.04.b.5.
[207] County Code, § 12-306-49-.04.b.15.
[208] County Code, § 12-306-44.03.b.7; § 12-306-49-.04.b.7.
[209] County Code, § 12-306-44.03.b.8; § 12-306-49-.04.b.8.
[210] County Code, § 12-306-44.03.b.9.
[211] County Code, § 12-306-44.03.b.10; § 12-306-49-.04.b.3
[212] County Code, § 12-306-44.03.b.11.
[213] County Code, § 12-306-44.03.b.12; § 12-306-49-.04.b.9.
[214] County Code, § 12-306-44.03.b.13; § 12-306-49-.04.b.10.
[215] County Code, § 12-306-49-.04.b.14.
[216] County Code, § 12-306-44.03.b.14; § 12-306-49-.04.b.11.
[217] County Code, § 12-306-44.03.b.15; § 12-306-49-.04.b.12.
[218] County Code, § 12-306-44.03.b.16; § 12-306-49-.04.b.13.

u. Whether the proposed use complies with all applicable provisions of the County Code;[219]

v. Whether the proposed use is compatible with zoning and land uses of nearby properties in terms of scale, site design, and operating characteristics, including hours of operation, traffic generation, lighting, noise, dust, and other external impact;[220]

w. Whether the proposed use is compatible with the character of the area;[221]

x. Suitability of the subject properties for the uses to which it has been restricted and for the uses which are proposed, but noting "special consideration" to areas "well suited for agricultural uses; **as the intent of these regulations is to permit other uses while maintaining the county's inventory of agricultural property**";[222]

y. Whether the use will cause significant adverse impacts on the natural environment;[223]

z. Whether the use will cause significant adverse impacts on community facilities, the transportation network, or utilities in the area;[224]

aa. Whether the use is in conformance with the Comprehensive Plan or other adopted plans for the area;[225]

bb. Whether it is appropriate to limit the period of time the proposed use is to be allowed and, if so, what that time period should be;[226]

---

[219] County Code, § 12-307-2.08.1.
[220] County Code, § 12-307-2.08.2.
[221] County Code, § 12-307-2.08.3.
[222] County Code, § 12-307-2.08.4 (emphasis added).
[223] County Code, § 12-307-2.08.2 [sic—should be 5].
[224] County Code, § 12-307-2.08.3 [sic—should be 6].
[225] County Code, § 12-307-2.08.4 [sic—should be 7].
[226] County Code, § 12-307-2.08.5 [sic—should be 8].

cc. Professional staff recommendation;[227] and

dd. Other relevant factors.[228]

346.    However, the County failed to consider these factors.

347.    The County's failure to consider other relevant, mandated factors renders the County's approval of the Application unreasonable.

348.    Moreover, if the County had fulfilled its obligations and considered these other relevant, mandated factors, the County could not have reasonably approved the Application, further rendering the Commission's approval unreasonable.

## CLAIMS FOR RELIEF

### Count 1 –
### Petition for Review of Reasonableness of County Action Pursuant to K.S.A. 12-760

349.    Plaintiffs incorporate and reallege all averments set forth above.

350.    The Kansas Zoning Enabling Act, K.S.A. 12-741, *et seq.*, and specifically K.S.A. 12-760, authorizes one aggrieved by a final decision of the County to bring an action in the appropriate district court within thirty days thereafter to determine the reasonableness of the decision.

351.    The County's approval of CUP-23-00312 is a final decision and appealable under K.S.A. 12-760.

352.    Plaintiffs, impacted by the Application's industrial power plant, are each aggrieved parties.

353.    The County's approval of the Application is unreasonable, invalid, and unlawful.

---

[227] County Code, § 12-307-2.08.6 [sic—should be 9].
[228] County Code, § 12-307-2.08 (Commissioners "shall consider **at least** the following factors" (emphasis added)).

354.    In particular, the County acted unreasonably, arbitrarily, and capriciously in approving the Application despite the fact that it was soundly rejected by both the Planning Commission and neighboring landowners because, among other reasons: (1) the County failed to follow its binding Comprehensive Plan, Solar Regulations, Northeast Sector Plan, North Lawrence Drainage Study, Food System Plan, Open Space Plan, Maple Grove Stormwater Management Standards, and the Airport's FAA-Regulated Wildlife Management Zone and glare impacts; (2) no amendment to the Comprehensive Plan—or any of these other plans, regulations, and standards—was sought to address the Application's failure to comply with these binding documents; (3) the Application was presented—and the County purportedly approved it—without all of the necessary documents and information, including, but not limited to, a stormwater plan or road management agreement; (4) the County's approval of the Application violates the Comprehensive Plan; (5) the Board's decision violates the *Golden Factors*; and (6) the County failed to consider criteria mandated by the County Code, thereby violating the same.

355.    The County lacks a proper legal or factual basis to approve the Application.

356.    Likewise, the County lacks a proper legal basis to failing to comply with the foregoing requirements and the actions mandated by K.S.A. 12-756.

357.    As a result of the County's unreasonable and unlawful actions as detailed above, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against the County, declaring that the County's action approving the Application was unreasonable, arbitrary, capricious, and unlawful and directing the County to reject the Application. Plaintiffs also request that the Court award their costs and attorneys' fees as allowed by law and grant any such other and further relief that the Court deems just and proper.

## **Count 2 – Mandamus**

358.     Plaintiffs incorporate and reallege all averments set forth above.

359.     Kansas law authorizes this Court to compel an inferior tribunal, corporation, or person to perform a specified duty, imposed by law. K.S.A. 60-801 *et seq.*

360.     Here, the County has a clearly defined duty to enforce and not violate, including, but not limited to:

    a. Kansas law prohibiting harming properties by accumulating and casting surface water onto another's land;

    b. Its own policies, procedures, and plans, as set forth herein, including, without limitation, those requiring developers to ensure the adequate drainage and control of stormwater caused by their development, and to prevent damage to surrounding property owners.

    c. Kansas law requiring a three-fourths majority to approve a *complete* Application after a valid protest petition.

361.     The County must fulfill these duties.

362.     Moreover, the County has openly declared that, by approving the Application in piecemeal fashion (including, by way of example, but not limitation, the purported approval of the Application without any valid, much less approved, stormwater plan or road maintenance agreement), the only vote that the Court is required to make unanimously is the boilerplate approval of the incomplete Application.

363.     The County has openly declared that it will circumvent Plaintiff's due process rights following the Planning Commission's denial of the Application and the valid protest petition.

364. The County does not possess discretion to ignore Kansas laws, regulations, caselaw, or the County's own policies, procedures, and plans.

365. The County possesses no discretion to approve the Application.

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment in mandamus in their favor and against Defendants (1) directing the County to reject the Application; (2) requiring the County to enforce mandatory State law and the County's Comprehensive Plan, including, but not limited to, stormwater plans and road maintenance agreements; (3) prohibiting the project to discharge stormwater onto Plaintiffs' properties; (4) pursuant to K.S.A. 60-802(c) for Plaintiffs' damages, costs, and attorneys' fees as provided under governing law in an amount to be proven.

**Count 3 –**
**Declaratory Judgment, Violation of Rights Secured by the Due Process and Equal**
**Protection Clauses of the Fourteenth Amendment to the U.S. Constitution and the Kansas**
**Constitution**

366. Plaintiffs incorporate and reallege all averments set forth above.

367. Plaintiffs possess liberty and/or property interests protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to U.S. Constitution and the Kansas Constitution.

368. These rights include, among other things, a liberty and/or property interest in their properties, and the equal protection and application of the law.

369. The County violated Plaintiffs' liberty and/or property rights by engaging in the actions described above.

370. The County's actions, including, without limitation, its differing treatment of property owners as described herein and refusal to comply with its governing documents, bears no rational relationship to a legitimate governmental purpose.

371.    The County's actions described herein were palpably arbitrary, capricious, unreasonable, and discriminatory and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and the Kansas Constitution.

WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the County violated Plaintiffs' rights as secured by the Due Process and Equal Protection Clauses of the United States Constitution and the Kansas Constitution; granting Plaintiffs all available relief under 42 U.S.C. §1983, including, without limitation, Plaintiffs' costs and attorneys' fees, and granting Plaintiffs such other and further relief that the Court deems just and proper.

### Count 4 – Breach of Contract

372.    Plaintiffs incorporate and reallege all averments set forth above.

373.    The Comprehensive Plan is a contract between the County and its citizens, including Plaintiffs.

374.    The County intended Plaintiffs, as citizens of the County, to benefit from the Comprehensive Plan.

375.    Sufficient consideration exists to support the contract because, among other things, the parties have agreed the obligations and benefits of the Comprehensive Plan in exchange for its predictability and consistency in approvals of land use.

376.    In the alternative, the County expected Plaintiffs to rely on the Comprehensive Plan, which Plaintiffs did, and the Court's refusal to enforce the Comprehensive Plan would result in fraud or injustice.

377.    Plaintiffs have performed and remain willing to perform in compliance with their obligations under the Comprehensive Plan.

378.    The County, by approving the Application and as detailed more fully above, breached the Comprehensive Plan.

379.    Plaintiffs have been damaged as a result of the County's unlawful actions.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order declaring the County in breach of the Comprehensive Plan and requiring specific performance of its obligations, and damages caused by Plaintiffs as a result of the County's breach.

## JURY TRIAL DEMAND

380.    Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

SKEPNEK LAW FIRM, P.A.
*/s/ William J. Skepnek        .*
William J. Skepnek  #10149
1 Westwood
Lawrence, Kansas 66044
(785) 856-3100 – Telephone
(785) 856-3099 – Facsimile
bskepnek@skepneklaw.com

FORBES LAW GROUP, LLC                   AND        FAGAN & EMERT, LLC
*/s/ Quentin M. Templeton        .*                */s/ Brennan P. Fagan        .*
Quentin M. Templeton #26666                        Brennan P. Fagan  #20430
Frankie J. Forbes #20725                           730 New Hampshire St., Ste. 210
12900 Metcalf Avenue, Suite 210                    Lawrence, KS 66044
Overland Park, Kansas 66213                        (785) 331-0300 - Telephone
(913) 341-8600 – Telephone                         (785) 331-0303 - Facsimile
(913) 341-8606 – Facsimile                         bfagan@faganemert.com
qtempleton@forbeslawgroup.com
fforbes@forbeslawgroup.com

ATTORNEYS FOR PLAINTIFFS